**Billy Wayne WALDROP, Petitioner,**

v.

**Morris THIGPEN, Commissioner, Alabama Department of Corrections, Respondent.**

**No. CV 90–H–1845–S.**

United States District Court, N.D. Alabama, Southern Division.

June 9, 1994.

See also, 459 So.2d 959; 459 So.2d 953.

878

Billy Wayne Waldrop, pro se.

Clifton S. Price, II, Kracke Thompson & Ellis, Birmingham, AL, Thomas J. Farrell, Cohen & Grigsby PC, Pittsburgh, PA, for petitioner.

J. Clayton Crenshaw, James H. Evans, Atty. Gen., Montgomery, AL, for respondent.

## MEMORANDUM OPINION

HANCOCK, District Judge.

This is an action for habeas corpus relief under 28 U.S.C. § 2254 by an Alabama state prisoner under a sentence of death. With the assistance of counsel, petitioner filed his petition for writ of habeas corpus on September 6, 1990, which was subsequently amended on September 25, 1990, and May 2, 1991.

### I. Factual and Procedural Background

In the late-night hours of June 2 or early-morning hours of June 3, 1982, Thurmon Macon Donahoo was robbed, beaten, shot, and his house burned to the ground. His body, charred almost beyond recognition, was found during an investigation of the fire.

Suspicion focused almost immediately upon the petitioner, Billy Wayne Waldrop. On July 26, 1982, petitioner was arrested in California on a charge of driving under the influence of alcohol. He later waived extradition and was returned to Alabama on the basis of a warrant issued by the Circuit Court of Calhoun County charging him with receipt of stolen property. Despite being extradited on the basis of a Calhoun County warrant, the petitioner was returned to Talladega County on August 19, 1982, where he ultimately gave two statements inculpating himself in the Donahoo robbery and murder. On December 17, 1982, petitioner was indicted on six counts of capital murder.[1] He appeared in court on December 21, 1982, and attorneys Hank Fannin and R.D. Pitts were appointed by the court to represent him. On December 29, 1982, he appeared for arraignment and entered a plea of not guilty.

Petitioner's trial commenced on February 14, 1983, and continued for four days. On February 18, 1983, the jury returned a verdict finding the petitioner guilty of all six counts charged in the indictment. A penalty trial followed immediately and on that same day, February 18, 1983, the jury unanimously voted to recommend imposition of the death penalty.

The trial court held its separate sentencing hearing on March 22, 1983, as required by Alabama Code § 13A–5–47. As a result of that hearing, the trial court entered findings of fact with respect both to the petitioner's guilt and with regard to the death sentence. Referring to the aggravating circumstances defined at Alabama Code § 13A–5–49, the trial court found two that applied:

> The defendant was previously convicted of two other felonies involving use or threats of violence to the person, both said felonies being murder in the second degree;
>
> \* \* \* \* \* \*
>
> The capital offense was committed while the defendant was engaged or was an accomplice to the commission of or an at-

---

1. All of the counts arose out of the robbery and murder of Thurmon Macon Donahoo. The first four counts of the indictment charged murder during the course of four separate permutations of first degree robbery. *See Alabama Code* § 13A–5–40(a)(2). Counts five and six charge murder during two separate types of first degree burglary. *See Alabama Code* § 13A–5–40(a)(4).

tempt to commit or flight after committing or attempting to commit robbery and burglary.

*(See Trial Record, Vol. I, p. 73)*. Furthermore, the trial court found no mitigating circumstances, either those defined by statute or otherwise. *(See Id., at 74)*. Oral notice of appeal was entered by petitioner's attorneys at the close of the hearing.

Petitioner was once again represented by Fannin and Pitts on direct appeal. In the brief filed on July 6, 1983, petitioner and counsel raised three claims:

1. Did the trial court commit reversible error in not honoring defendant's motion for commitment to a mental institution for examination?

2. Did the trial court commit reversible error in denying defendant's motion for change of venue?

3. Did the trial court commit reversible error by allowing the alleged confessions of defendant into evidence?

*(See Tab R–29 )*. Issues one and two each merited only one page of argument in petitioner's brief, while ground three received slightly less than two and one-half pages of argument. No cases were cited in any of the arguments. Later, an amended brief was filed in which one additional paragraph was argued with respect to the voluntariness of petitioner's confessions, and a fourth claim of error was raised. The fourth claim was "Did the trial court commit reversible error by allowing prejudicial and inflammatory remarks against the defendant by the State in closing arguments?" The entire argument offered in support of that claim was as follows:

The trial court allowed the district attorney to call the defendant a "murderer" and a "robber" (R–550) on more than one occasion during his closing argument and further stating words to the jury to this effect, "Billy Wayne Waldrop and his partners in crime had no more regard for human life than you and I for a fly we swatted." (R–556).

The Alabama Court of Criminal Appeals rejected each of these assignments of error. Moreover, the court explained:

In accordance with Section 13A–15–53, *Code of Alabama (1975)*, we have reviewed the sentence proceedings in this case and find no error.

Additionally, the trial court's findings concerning the aggravating and mitigating circumstances are supported by the evidence. After considering each of the ·aggravating and mitigating circumstances set out in the statute, the court found that Waldrop and his accomplices entered the victim's home, robbed him, killed him, and then burned his house and body. The court also found that Waldrop had committed two prior murders. No evidence of any mitigating circumstances was introduced.

This court further finds that the sentences were not imposed under the influence of passion, prejudice, or any other arbitrary factor. An independent weighing of the aggravating and mitigating circumstances by this court indicates that death was the proper sentence in this case. Finally, the sentence of death is not excessive or disproportionate to the penalty imposed in similar cases. *Beck v. State,* 396 So.2d 645 (Ala.1980).

We have searched the record and have found no error prejudicial to the substantial rights of Waldrop. The judgment of the circuit court is affirmed.

*Waldrop v. State,* 459 So.2d 953, 956 (Ala. Crim.App.1983). Rehearing was denied by the Court of Criminal Appeals on January 10, 1984.

To prosecute petitioner's further appeal to the Alabama Supreme Court, required by Rule 39(c) of the *Alabama Rules of Appellate Procedure,* Dennis N. Balske was appointed, and he filed a petition for writ of certiorari on April 5, 1984. In a brief filed with the petition for writ of certiorari, two issues were raised:

1. Defendant was deprived of his constitutional right to a fundamentally fair trial when the prosecution urged the jury to convict him and sentence him to death for improper and irrelevant reasons.

2. That feature of the Alabama capital sentencing scheme which requires trial

judges to determine the appropriate sentence and allows them to reject a jury recommendation of life without parole violates rights guaranteed defendant both under the Alabama and United States Constitutions.

(*See Tab R–33* ). In support of the first argument, petitioner asserted that the closing arguments of the prosecutor during both the guilt and penalty phases of the trial were improper and denied him fundamental fairness by (1) vouching for the credibility of the witnesses, (2) exhorting the jury to join the war against crime, (3) including a patriotic pitch for the protection of society, (4) calling for the jury to rely on the district attorney, and (5) offering extrinsic or unproven factors. On September 28, 1984, the Alabama Supreme Court rejected each of these arguments and affirmed the conviction and sentence. *See Ex parte Waldrop*, 459 So.2d 959 (Ala.1984). Re-hearing was denied on November 9, 1984.

In February of 1985 [2] a petition for writ of certiorari to the Alabama Supreme Court was filed in the United States Supreme Court, but denied on April 15, 1985.

Within two months after the denial of a petition for writ of certiorari by the United States Supreme Court, petitioner filed his state petition for writ of error coram nobis in the Circuit Court of Talladega County on June 4, 1985. This petition was filed with the assistance of Attorney Dennis Sweet. Petitioner asserted four broad claims for relief, several of which included multiple subclaims.

Under his first claim for coram nobis relief, ineffective assistance of trial and appellate counsel, petitioner alleged the following:

1. Trial counsel failed to investigate, prepare, and present mitigating evidence at the sentencing phase of petitioner's trial.

2. Trial counsel failed to move the court for appointment of an independent defense psychiatric or psychological expert.

3. Trial counsel failed to move to suppress petitioner's inculpatory statements obtained in violation of his Fourth, Fifth, Sixth, and Fourteenth Amendment rights.

4. Trial counsel failed to file pretrial motions:

 a. to challenge the removal of prospective jurors opposed to the death penalty.

 b. to attack the death penalty as applied in Alabama because it is arbitrary, capricious, and applied in a discriminatory fashion with respect to the race of the victim.

 c. to suppress the pretrial statements of the petitioner, and

 d. to seek an individual sequestered voir dire of the jury venire.

5. Trial counsel failed to preserve several errors at trial for issues on appeal, including:

 a. hearsay testimony offered by witness Hugh Whistenant.

 b. improper impeachment by the prosecution of its own witness, Milton Gaither, with respect to the witness's prior felony convictions.

Ground number two in petitioner's coram nobis petition attacked the admission into evidence of his inculpatory, pretrial statements. He asserted that his lengthy detention in the Talladega County Jail without the appointment of counsel violated his Fourth, Sixth, and Fourteenth Amendment rights, tainting the two pretrial confessions he gave.

Claim three alleged in the coram nobis petition asserted that the removal of two prospective jurors, Melissa Britt and Willie Best, because of their opposition to the death penalty, violated the petitioner's Sixth and Fourteenth Amendment rights to a fair and impartial jury composed of a cross-section of the community.

Finally, coram nobis-claim four alleged that the Alabama death penalty was applied

---

**2.** Although the exact date of the filing of the petition in the United States Supreme Court is unclear, the date on the attorney's signature is February 7, 1985. After the State of Alabama filed a responsive brief in opposition to granting

certiorari, the United States Supreme Court denied the petition on April 15, 1985. *See Waldrop v. Alabama*, 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1985).

in a racially-discriminatory fashion, more frequently resulting in the imposition of a death sentence when the victim of the killing was white. At paragraph 42 of the petition, petitioner alleged "Sociological and statistical studies produced by Dr. Bernie Bray of Talladega College conclude that defendants accused of killing white victims are considerably more likely to receive death than those who kill blacks." (*See Tab R–41*, p. 17).

In its answer, the respondent State of Alabama expressly asserted that claims two, three, and four were barred from review in coram nobis either because they were raised and rejected on direct appeal or were available but not raised on direct appeal. (*See Tab 4–42*).

The trial court conducted a full evidentiary hearing on the petition for writ of error coram nobis on April 3, 1986. Fourteen witnesses testified and the transcript of the hearing covers some 444 pages. On July 28, 1986, the trial judge filed his 52–page memorandum opinion and final judgment denying coram nobis relief. All but three pages of that opinion dealt with petitioner's claims relating to ineffective assistance of counsel. In the final pages of the opinion, the trial court concluded that claim two for coram nobis relief was barred from review "because it was raised on direct appeal." Similarly, claims three and four were rejected because they "could have been raised at trial and on direct appeal but [were] not." The trial court explained that coram nobis cannot serve as a substitute for direct appeal and does not lie to review claims that could have been raised at trial and on direct appeal. (*See Tab R–43, pp. 50–51*). On September 5, 1986, petitioner filed his timely notice of appeal from denial of coram nobis.

Represented on appeal by Attorney Daniel R. Farnell, Jr., petitioner appealed all four general claims for coram nobis relief asserted in the Circuit Court of Talladega County. Although petitioner's brief expressly reincorporated all of the alleged errors of counsel set out in the original coram nobis petition, the principal focus of the argument in the brief was on counsel's failure to present mitigating evidence during the penalty phase of trial. As to claim two, the appellate brief argued violations of the Fourth, Fifth, Sixth, and Fourteenth Amendment rights of the petitioner.

On April 28, 1987, the Alabama Court of Criminal Appeals affirmed the denial of coram nobis relief in *Waldrop v. State*, 523 So.2d 475 (Ala.Crim.App.1987) (*See Tab R–53*). In doing so, the appellate court adopted the findings of fact made by the coram nobis court with respect to petitioner's claim of ineffective assistance. Furthermore, the court rejected on the merits each of petitioner's claims that the admission of his confessions violated the Fourth, Fifth, Sixth, and Fourteenth Amendments. The court also concluded that petitioner's counsel was not ineffective because he failed to move for a pretrial hearing to suppress the confessions. Finally, the court also concluded that petitioner's counsel was not constitutionally ineffective because he failed to challenge the exclusion of death-qualified jurors and failed to challenge the allegedly discriminatory application of the death penalty to defendants accused of killing whites.[3] The Court of Criminal Appeals denied re-hearing on March 8, 1988, and the Alabama Supreme Court denied a petition for writ of certiorari on April 22, 1988.[4] (*See Tab R–53*). A

---

**3.** The Court notes that the Alabama Court of Criminal Appeals addressed claims two, three, and four in the context of ineffectiveness of counsel. This Court does not read the original petition for writ of error coram nobis, however, as raising ineffectiveness claims under claims two, three, and four. The effectiveness of counsel issue apparently arose in response to the arguments advanced by petitioner in his brief. After the coram nobis court rejected claims two, three, and four on procedural default grounds, petitioner argued on appeal that the ineffectiveness of his representation at trial justified consideration of these claims on the merits. Although not

described in those terms, petitioner apparently was arguing that there was cause and prejudice for his procedural defaults found by the coram nobis court and that the cause was ineffectiveness of counsel at trial and on appeal. The Court of Criminal Appeals rejected that argument, finding no ineffectiveness of counsel with regard to the defaulted issues under claims two, three, and four.

**4.** On the petition for writ of certiorari in the Alabama Supreme Court, petitioner was represented by yet another set of attorneys, James M. Wooten and L. Dan Turberville.

petition for writ of certiorari filed in the United States Supreme Court also was denied on October 3, 1988. *See Waldrop v. Alabama,* 488 U.S. 871, 109 S.Ct. 184, 102 L.Ed.2d 154 (1988).

Shortly after the denial of certiorari by the United States Supreme Court, the cycle of state collateral review began again. A petition pursuant to Rule 20 of the Alabama (Temporary) Rules of Criminal Procedure, seeking to vacate and set aside the conviction and death sentence, was filed in the Talladega County Circuit Court on November 18, 1988. Petitioner was assisted by Attorneys L. Dan Turberville and James M. Wooten. Under three broad categories, petitioner asserted claims for relief based on ineffective assistance of trial counsel, ineffective assistance of appellate counsel, and ineffective assistance of coram nobis counsel. Under the rubric of ineffective assistance of trial counsel, petitioner alleged the following deficiencies:

1. Trial counsel failed to adequately investigate petitioner's mental, emotional, and psychological background in order to prepare and present mitigating evidence at trial and at the sentencing phase of the trial.

2. Trial counsel failed to seek an independent psychological or psychiatric examination of the petitioner.

3. Trial counsel failed to move to suppress the inculpatory statements obtained from the petitioner in violation of his Sixth and Fourteenth Amendment rights.

4. Trial counsel failed to object to the trial court's striking of prospective jurors because of their opposition to the death penalty.

5. Trial counsel failed to challenge the application of the Alabama death penalty because it is imposed in a fashion that discriminates on the basis of the race of the victim.

6. Trial counsel failed to object to hearsay testimony offered at trial.

7. Trial counsel failed to effectively and adequately impeach the criminal background of a material witness.

8. Trial counsel failed to seek sequestration of the jury.

Petitioner also alleged ineffective assistance of counsel because (1) his attorney on direct appeal failed to cite any authority to support the merits of the petitioner's brief, and (2) appellate counsel failed to preserve and present as issues on appeal all of the claims asserted in the context of ineffective assistance of trial counsel. Finally, the petitioner also asserted that his coram nobis counsel was ineffective. (*See Tab R–54* ).

In an order entered August 4, 1989, the Circuit Court of Talladega County denied Rule 20 relief. As to the first seven allegations of ineffective assistance of trial counsel, the court found that they had been raised in the petition for error coram nobis and, therefore, the Rule 20 petition was successive as to these grounds. The court specifically cited Rule 20.2(b) and Rule 20.2(a)(4) as grounds for denying review of the merits of these claims. Similarly, citing Rule 20.2(b), the court concluded that the eighth specification of ineffective assistance of trial counsel could have been asserted in the petition for writ of error coram nobis and, because it was not, was barred from review in the Rule 20 action.

As to petitioner's allegations of ineffective assistance of appellate counsel, the court again cited Rule 20.2(b) to deny review. The court concluded that these claims "were known or could have been known at the time the first petition was heard" and, therefore, were barred from review in this action. Finally, the court also denied petitioner's claim of ineffective assistance of coram nobis counsel, citing *Pennsylvania v. Finley,* 481 U.S. 551, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987), for the proposition that there is no Sixth Amendment right to the assistance of counsel in collateral proceedings.

The petitioner immediately filed his notice of appeal on August 23, 1989, but the Alabama Court of Criminal Appeals affirmed the denial of Rule 20 relief without a published opinion on January 19, 1990. *See Waldrop v. State,* 564 So.2d 115 (Ala.Crim.App.1990) (Table). That court denied re-hearing on February 23, 1990, and there is no indication

in the record that petitioner sought certiorari either to the Alabama Supreme Court or the United States Supreme Court. The instant habeas corpus petition, petitioner's first, was filed in this court on September 6, 1990.

## II. Issues

Without identifying all the various sub-issues asserted, petitioner seeks habeas corpus relief under § 2254 on the basis of seven major claims. Under claim one, petitioner avers that his Fourth, Fifth, Sixth, and Fourteenth Amendment rights were violated when an inculpatory, pretrial statement he made was introduced into evidence at trial. He argues that these confessions violated the Fourth Amendment because he was held and isolated in Talladega County without being presented to a judicial officer for a period of four months after his return to Alabama. During that time, he also asserts that his Sixth Amendment right to the assistance of counsel was violated and that he was pressured, duped, and induced into waiving his Fifth Amendment privilege against self-incrimination.

Habeas claim two involves an assortment of allegations of ineffective assistance of trial and appellate counsel. The particular errors of counsel alleged in the petition are discussed more thoroughly in Section III below.

He alleges at habeas claim three that he was denied the appointment of a defense psychiatric or psychological expert to assist in the preparation and presentation of his defense. Prosecutorial misconduct is the subject of petitioner's fourth claim for habeas relief, focusing upon various remarks made by the prosecutor during his closing arguments at trial. Claim five alleges that hearsay evidence was included in a presentence report considered by the sentencing judge, which deprived the petitioner of his right to confront and cross-examine his accusers.

In the first of two amendments to the petition, petitioner added claim six on September 25, 1990. It asserted that one of the aggravating factors found by the trial court

to exist and to justify the imposition of the death penalty was itself invalid. Specifically, he claimed that his two prior murder convictions, which were found to be an aggravating factor, were themselves invalid because they were based upon involuntary guilty pleas entered by the petitioner. Claim seven was added in the second amended petition on May 2, 1991, and it asserts that the trial court's oral instructions to the jury on the definition of "reasonable doubt" violated due process because reasonable doubt was equated with an "actual and substantial doubt."

In its responses to the petition, the State asserts that a number of these claims and issues are procedurally barred from review on the merits. The State identifies in particular claims three, four, five, six, and seven as being subject to one or more forms of procedural default. Furthermore, the State contends that several specific allegations of ineffective assistance of counsel are also procedurally barred inasmuch as those specific assignments of attorney error were not previously argued or presented in an appropriate state proceeding.

## III. Illegally Obtained Confession

During the time the Petitioner was held in the Talladega County Jail, he made two inculpatory statements to law enforcement officers in which he confessed to participating in the robbery and murder of Macon Donahoo. The first statement was on September 15, 1982, and the second on October 18, 1982. Petitioner challenges the validity of his conviction based on the admission at trial of the October 18, 1982, confession which petitioner claims was elicited from him in violation of his Fourth, Fifth, Sixth, and Fourteenth Amendment rights.[5] Specifically, Petitioner alleges that his four-month detention in the Talladega County Jail without probable cause and without presentation to a judicial officer violated his Fourth Amendment protection against unlawful seizures so that statements made by the petitioner during that time were tainted by the illegal detention and, thereby, inadmissible.[6] Further, he alleges that al-

---

5. The September 15, 1982, statement was not introduced at trial.

6. In his memorandum brief, Petitioner states that he does not seek to raise a Fourth Amendment claim. Rather, Petitioner asserts that the

though he was advised of his *Miranda* rights, he was pressured into waiving his Fifth Amendment privilege against self-incrimination. Petitioner further argues that his Sixth Amendment right to counsel had attached prior to the time the statements were procured and that any interrogation in the absence of counsel violated his Sixth Amendment rights.

### A. Fifth Amendment

Petitioner alleges that his conviction violated due process of law because it was based in part on a confession taken from him in violation of his Fifth Amendment privilege against self-incrimination. The tenor of Petitioner's Fifth Amendment claim has changed over the course of his trial, appellate and collateral proceedings. At trial and on direct appeal, Petitioner raised a Fifth Amendment claim based on the inadequacy of the *Miranda* warnings given to him immediately prior to custodial interrogation and because inducements were offered by the Talladega County officials.[7] In his petition for writ of error coram nobis filed with the Circuit Court of Talladega County, petitioner raised no independent Fifth Amendment claim. In the instant action, he supplements his original claim by arguing that his Fifth Amendment right to counsel was invoked at his arraignment in California on the offense of driving while intoxicated, which prohibited the subsequent initiation of interrogation by

police officers regarding *any* crime.[8] *See Petitioner's Memorandum of Law in Opposition to Respondent's Motion for Summary Judgment and In Support of Petitioner's Motion for Summary Judgment* at p. 14.

### (1) Adequacy of Miranda Warnings and Voluntariness of Confession

A confession is not admissible unless it is both voluntarily given and, if made by one in custody, preceded by the prophylactic warnings set out in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *See, e.g., Maine v. Moulton*, 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985); *Michigan v. Tucker*, 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974). While the ultimate question of the voluntariness of a confession is a matter for independent review by the federal habeas court, the subsidiary and historical facts found by the state trial court are presumed correct under 28 U.S.C. § 2254(d). *See Miller v. Fenton*, 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985). The federal habeas court must apply the presumption of correctness to the state court's findings of fact unless one of the exceptions enumerated in § 2254(d) applies.[9] As the U.S. Supreme Court explained:

Of course, subsidiary questions, such as the length and circumstances of the interrogation, the defendant's prior experience

---

"State's egregious violation of [his] Fourth Amendment rights is but one way in which the State's tactics are 'so offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment.' *Miller v. Fenton*, 474 U.S. 104, 108 [106 S.Ct. 445, 448, 88 L.Ed.2d 405] (1985)."

**7.** Since this issue was raised at trial and exhausted on appeal, no procedural default issue exists.

**8.** Petitioner's appearance before a judicial officer in California was an extradition hearing where Petitioner waived extradition to Alabama, not an arraignment.

**9.** The presumption of correctness applies unless:

(1) that the merits of the factual dispute were not resolved in the State court hearing; (2) that the factfinding procedure employed by the State court was not adequate to afford a

full and fair hearing; (3) that the material facts were not adequately developed at the State court hearing; (4) that the State court lacked jurisdiction of the subject matter or over the person of the applicant in the State court proceeding; (5) that the applicant was an indigent and the State court, in deprivation of his constitutional right, failed to appoint counsel to represent him in the State court proceeding; (6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or (7) that the applicant was otherwise denied due process of law in the State court proceeding; (8) or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record. 28 U.S.C.A. § 2254(d) (West 1987).

with the legal process, and familiarity with the *Miranda* warnings, often require the resolution of conflicting testimony of police and defendant. The law is therefore clear that state-court findings on such matters are conclusive on the habeas court if fairly supported in the record and if the other circumstances enumerated in § 2254(d) are inapplicable. But once such underlying factual issues have been resolved, and the moment comes for determining whether, under the totality of the circumstances, the confession was obtained in a manner consistent with the Constitution, the state-court judge is not in an appreciably better position than the federal habeas court to make that determination.

*Miller v. Fenton,* 474 U.S. 104, 117, 106 S.Ct. 445, 453, 88 L.Ed.2d 405, 415 (1985). None of the exceptions to the presumption of correctness applies here.

■ The Circuit Court of Talladega County conducted at least two separate evidentiary hearings on this issue. At trial, upon petitioner's oral motion to suppress, the court conducted an evidentiary hearing outside the presence of the jury on the admissibility of the October 18, 1982, statement. The court concluded that the confession was given voluntarily and not in violation of petitioner's constitutional rights. (*See* Tab R–11, *Trial Transcript* at 459). During the hearing, the court heard testimony from several Talladega County officials and from Petitioner. Detective Dennis Surrett of the Talladega County Sheriff's Department testified that he advised the Petitioner of his *Miranda* rights before the petitioner made his statement on October 18, 1982, as follows:

> You have the right to talk to a lawyer and have him present with you while you are being questioned. If you want a lawyer and cannot afford one, the court will appoint one for you. You have the right to remain silent. Anything you say, can, and will be used against you in a court of law.

*Trial Transcript* at p. 362.[10] When asked if he understood each of these rights, the Peti-

tioner replied that he did. When asked if, having these rights in mind, Petitioner wished to talk to the authorities, petitioner replied that he did. Surrett further testified that no threats or promises were made to induce petitioner's statement. After some discussion, a tape recording of petitioner's October 18, 1982, statement was played for the court, which included a recording of Surrett administering the *Miranda* warnings and petitioner's oral waiver. Detective Surrett testified that although the Petitioner had asked for a "lie detector test," neither he nor anyone in his presence told him that the purpose of the statement was to prepare him for a polygraph examination. As to the suspension of petitioner's visitation privileges, Sheriff Studdard testified that these privileges were suspended when weapons were found on persons attempting to visit the Petitioner at the jail.

The court then heard testimony from the Petitioner, Billy Wayne Waldrop. Waldrop testified that his rights were read to him on only two occasions: once before the September 15, 1982, statement and the day before the polygraph examination, which was October 18, 1982. He said that Detective Surrett advised him that the recorded statement was needed in connection with a polygraph test to be taken the next day. Additionally, Waldrop stated that Sheriff Studdard told him that he would have no more visitor or telephone privileges until he "came straight," which Sheriff Studdard denied. When Waldrop denied that he understood the meaning of the *Miranda* warnings, District Attorney Robert Rumsey recounted as many as nine prior occasions when petitioner had been charged with a crime and his rights had been read to him, indicating petitioner's familiarity with the rights warning. Detective Surrett testified that Petitioner remarked to District Attorney Rumsey on September 15, 1982, after being read a five-point warning, that he knew the rights better than the officers did. He further stated that "he didn't have a

---

**10.** These warnings constitute what is known, and referred to herein, as a four-point warning. The case of *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), establishes what is known as a five-point warning, which includes advising that the witness may stop the questioning at any time once it has begun and invoke his Fifth Amendment protection. Together these warnings are commonly referred to as the *Miranda/Edwards* rule.

lawyer and didn't want a lawyer." *Trial Transcript* at 421. According to Detective Surrett, at no time did the Petitioner request to have an attorney present before speaking to the officials.

After hearing the above testimony at the suppression hearing, the trial judge denied the motion to suppress the confession. Plainly implicit in this conclusion are the findings that petitioner was not pressured, tricked, or induced into making the statement, and that he did not request the assistance of an attorney prior to his interrogation. If the trial court had believed the petitioner's testimony, it could not have denied the motion to suppress the confession. Though the state trial court did not make its findings explicitly, this court may reconstruct those findings "either because [the state trial judge's] view of the facts is plain from his opinion, or because of other indicia." *Townsend v. Sain,* 372 U.S. 293, 314, 83 S.Ct. 745, 758, 9 L.Ed.2d 770 (1962). By admitting the confession into evidence, the court clearly demonstrated that it believed the testimony of the Talladega officials over the testimony of the Petitioner. *See Thompson v. Linn,* 583 F.2d 739 (5th Cir.1978).

■ There was also extensive testimony taken by the trial court during the hearing on petitioner's error coram nobis petition.[11] The trial court noted that the petitioner's testimony was largely the same as his testimony at the suppression hearing, with the addition of allegations that he made the September 15, 1982, statement so that his conjugal visits would be restored, and that he requested a lawyer before the September 15, 1982, statement. Again, Sheriff Studdard, Detective Surrett, and Detective Hurst testified at the hearing, along with District Attorney Robert Rumsey. Studdard testified that he never allowed petitioner to receive conjugal visits in the Talladega County Jail, that he never told petitioner that such visitation

privileges would be suspended unless he confessed, and that Petitioner never requested an attorney in his presence. District Attorney Rumsey testified the Petitioner never requested an attorney in his presence and that he never had the Petitioner's visitation, conjugal or otherwise, stopped as a part of an attempt to elicit a confession. Detective Surrett testified that the Petitioner never requested an attorney in his presence and that the Petitioner was not promised leniency in exchange for his confession. Detective Hurst testified that the Petitioner never requested an attorney in his presence, that the Petitioner was not promised leniency in exchange for his confession, and that he never told the Petitioner that his visits would be stopped until he confessed. The court expressly found the testimony of Studdard, Rumsey, Surrett, and Hurst to be credible and found the testimony of the petitioner not to be credible.[12]

■ From a review of the transcripts of both hearings, the court concludes that both the explicit and implicit findings of fact made by the state court are fully supported by the record. It shows that petitioner was properly advised of the *Miranda* warnings prior to the September 15 and October 18 statements. He was also "Mirandized" on at least seven other occasions. Both four-point and five-point warnings were given to the petitioner. It should be noted here that the *Miranda* warnings are not themselves constitutional rights protected by the Fifth Amendment; rather, they are prophylactic measures established by the Supreme Court to insure that the Fifth Amendment right against self-incrimination is protected. *Duckworth v. Eagan,* 492 U.S. 195, 109 S.Ct. 2875, 106 L.Ed.2d 166 (1989). There is no "talismanic incantation required to satisfy the strictures" of *Miranda. Id.* (quoting *California v. Prysock,* 453 U.S. 355, 101 S.Ct. 2806, 69 L.Ed.2d 696 (1981)). As long as the

---

11. The court recognizes that the findings of fact made by the trial court resulting from the error coram nobis hearing were in the context of an ineffective assistance of counsel claim, and that no independent Fifth Amendment claim was raised. However, for purposes of § 2254(d) the findings of fact are nevertheless presumptively correct as to all claims.

12. The credibility of witnesses is a factual determination to which this court must accord a presumption of correctness. *Stokes v. Singletary,* 952 F.2d 1567, 1573 (11th Cir.1992).

warnings reasonably convey the requirements of *Miranda*, the reviewing court need not concern itself with the precise formulation of the warnings. *Id.* Accordingly, the court concludes that the requirements of *Miranda* were satisfied.

The state court's factual findings must also be considered in determining whether the confession was voluntary. In analyzing the voluntariness of a confession, the federal habeas court must make an independent examination of the totality of the circumstances surrounding the confession. *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). The standard for making this evaluation is whether the accused made "an independent and informed choice of his own free will, possessing the capacity to do so, his will not being overborne by the pressures and circumstances swirling around him." *United States v. Rouco,* 765 F.2d 983, 993 (11th Cir.1985) (quoting *Jurek v. Estelle,* 623 F.2d 929 (5th Cir.1980)). The confession must be a product of the accused's free and deliberate choice rather than the product of coercion, intimidation, or deception by the police. *United States v. Mendoza–Cecilia,* 963 F.2d 1467, 1475 (11th Cir.1992). Factors relevant to the inquiry include the accused's intelligence, the length of detention, the nature of interrogation, use of physical force, and promises or inducements. *See Colorado v. Connelly,* 479 U.S. 157, 163 n. 1, 107 S.Ct. 515, 520 n. 1, 93 L.Ed.2d 473, 482 n. 1 (1986); *Campaneria v. Reid,* 891 F.2d 1014 (2d Cir. 1989). Each of these factors, along with other surrounding circumstances, combine to determine the crucial question—was there any "overreaching" on the part of the police. *Colorado v. Connelly,* 479 U.S. at 163, 107 S.Ct. at 520.

The Talladega police first interrogated the petitioner about the Donahoo murder on August 4, 1982, after his arrest in California. Following a lengthy extradition process, his detention in the Talladega County Jail commenced on August 19, 1982. However, he was not detained for the sole purpose of questioning him as a murder suspect; he was jailed on a pending receiving stolen property charge in Calhoun County, Alabama. More-

over, the petitioner preferred confinement in the Talladega County Jail to be near his family and to attempt to control the investigation. On occasion, he would request to speak to the Talladega detectives about the investigation. The petitioner alleges that he was interrogated ten times prior to his September 15, 1982, statement. However, there is nothing in the record to indicate that any single session was exhaustingly lengthy. There is no evidence that the police used any physical force against the petitioner or that they threatened or harassed him in any way. The trial court found that the statements were not conditioned upon the granting of conjugal visits or the taking of a polygraph examination, and this finding is supported by the evidence. As to the petitioner's intelligence, there is no evidence which suggests that he was unable to comprehend the *Miranda* warnings or the consequences of his waiver of those rights. He stated to the police that he understood the rights better than they did and his past criminal history evinces his familiarity the warnings and the legal system in general. As to his diminished mental capacity resulting from prior brain surgery, there is no evidence in the record, from either the suppression hearing or coram nobis hearing, which suggests that the petitioner suffered any mental disability. By allowing the statement to be admitted into evidence, the trial court found implicitly that the petitioner was mentally capable of understanding his rights. Additionally, the petitioner's neurosurgeon, Dr. Zeiger, testified by deposition in the coram nobis proceeding that the petitioner suffered no permanent disability or diminished capacity from the surgery. *See Waldrop v. State,* 523 So.2d 475, 484 (Ala.Crim.App.1987).

After a review of the evidence, it appears that the custodial interrogation of the petitioner was free of coercion, intimidation and deception. There is no indication that the petitioner's ability to resist had been overborne by any misconduct or overreaching on the part of the police. Accordingly, the court concludes that the totality of circumstances demonstrates that the confessions given by

the petitioner on September 15, 1982, and October 15, 1982, were voluntary.[13]

### (2) Request For Counsel In California

■ Petitioner claims that his representation by the Public Defender's Office at his extradition hearing in California triggered his Fifth Amendment right to counsel and that any subsequent statement elicited by police outside the presence of his counsel was unconstitutionally obtained and inadmissible. In support of this allegation, petitioner relies on the rule established in *Arizona v. Roberson*, 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988), that police may not initiate interrogation of a suspect as to a second, unrelated crime without providing counsel when the suspect has previously requested counsel during interrogation regarding a different crime.

The petitioner advances this argument for the first time in this action. In support of this argument, the affidavit of James Dorr, a former deputy public defender in San Bernardino County, California, was submitted along with copies of documents from the public defender's file on the petitioner. This argument and the supporting documents were not presented at trial, on direct appeal, or on collateral review. To the contrary, his petition for writ of error coram nobis states that no attorney was appointed for the petitioner in California. *See* Tab R–41 p. 3. Although petitioner raised a Fifth Amendment challenge to the admissibility of his confession at trial and on appeal, the factual elements and legal theory he now advances relating to representation in California were never presented to the state courts.

■ To satisfy the exhaustion requirement, a habeas petitioner must have "fairly presented" the federal claim to the state courts. *Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d 438, 443 (1971). A claim is not "fairly presented" unless *all* of the essential factual elements *and* the same legal theories are raised in state court, giving the state court an opportunity to apply the controlling legal principles to the facts. *Id.;* see *Bunch v. Thompson*, 949 F.2d 1354 (4th Cir.1991) (additional claims of ineffective assistance of counsel procedurally barred; also, fifth amendment "right to remain silent claim" procedurally barred when fifth amendment "right to counsel claim" allowed). Although this particular Fifth Amendment theory appears to be unexhausted, dismissal to allow the petitioner to exhaust this claim would be futile. Because the claim has never been presented to a state court, the question becomes whether there now is a state remedy available to him. *See Collier v. Jones*, 910 F.2d 770 (11th Cir.1990). The collateral attack ordinarily available under Rule 32 of the Alabama Rules of Criminal Procedure is barred because more than two years has elapsed since petitioner's conviction became final. *See Ala.R.Crim.P.* 32.2(c). Because this state remedy is procedurally barred by the time limitation, habeas relief also is procedurally barred. *Collier v. Jones*, 910 F.2d 770 (11th Cir.1990); *Burger v. Zant*, 984 F.2d 1129 (11th Cir.1993).

■ If a petitioner has procedurally defaulted on a constitutional claim, he is barred from litigating that claim in a federal habeas corpus proceeding unless he can show *both* cause for and actual prejudice from the default. *Engle v. Isaac*, 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982); *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d

**13.** Although the issue was not raised by the petitioner, the court's finding of voluntariness as to the September 15 confession eliminates the issue of whether the October 18 confession was "tainted" by the earlier statement, and thereby inadmissible. The October statement was not inadmissible under the "fruit of the poisonous tree" theory because this theory applies only when a constitutional violation has occurred. *Martin v. Wainwright*, 770 F.2d 918, 928 (11th Cir.1985). The court finds no constitutional violation surrounding the September 15 statement. Neither does the "cat out of the bag" theory render the October statement inadmissible. As the United States Supreme Court, rejecting the "cat out of the bag" theory, explained: "When neither the initial nor the subsequent admission is coerced, little justification exists for permitting the highly probative evidence of a voluntary confession to be irretrievably lost to the factfinder." *Oregon v. Elstad*, 470 U.S. 298, 312, 105 S.Ct. 1285, 1294–95, 84 L.Ed.2d 222 (1985).

898

594 (1977). The petitioner cannot show prejudice because the claim fails on its merits.[14]

 First, the rule established in *Arizona v. Roberson, supra,* is not retroactively available to support the petitioner's habeas corpus petition. *Butler v. McKellar,* 494 U.S. 407, 110 S.Ct. 1212, 108 L.Ed.2d 347 (1990).[15] Prior to *Roberson,* an invocation of the Fifth Amendment right to counsel was offense-specific, i.e., it did not extend to investigations of crimes unrelated to the one for which the suspect was originally held. Therefore, had petitioner invoked his Fifth Amendment right to counsel with respect to either the California DUI charge or the Calhoun County charge of receiving stolen property, the interrogation by the Talladega officials regarding the murder was not contrary to established law at the time.

 Second, petitioner's argument does not fall within the rule of *Roberson* or its progeny because the petitioner never invoked his Fifth Amendment rights. The Fifth Amendment privilege against self-incrimination must be asserted or claimed; it is not self-executing. *United States v. Monia,* 317 U.S. 424, 63 S.Ct. 409, 87 L.Ed. 376 (1943). Unless the privilege is expressly invoked, the witness cannot be said to have been "compelled" to testify against himself within the meaning of the Fifth Amendment. *Id.* There must be some expression of a desire to deal with the police only through counsel. *Collins v. Francis,* 728 F.2d 1322, 1332 (11th Cir.1984). The appointment of counsel at an arraignment or, as in the instant case an extradition hearing, does not invoke the *Miranda/Edwards* Fifth Amendment right to counsel. *Id.* A simple request for representation at a judicial proceeding does not by itself trigger the Fifth Amendment privilege. Rather, it indicates a desire for counsel under the Sixth Amendment. *Id.* at 1333.

 There is no evidence here that the petitioner indicated in any manner that he wished to invoke his Fifth Amendment privilege in California by requesting counsel prior to interrogation. While a public defender did appear in petitioner's behalf at the extradition hearing, there is nothing in the record which indicates that the petitioner expressly requested counsel in California. The affidavit of indigency attached as Exhibit D–2 to James Dorr's affidavit is not signed by the petitioner. Indeed, the petitioner testified that he did not request counsel until he was in the Talladega County Jail. Even so, had he requested the presence of the public defender at the extradition hearing, this representation would only implicate petitioner's Sixth Amendment rights in connection with the receiving stolen property charge on which he was extradited to Alabama. Consequently, the petitioner's Fifth Amendment claim based on his request for counsel in California is without merit.

**B. Procedural Default on 4th and 6th Amendment Claims**

The only claim concerning the admissibility of petitioner's confession presented at trial and on direct appeal was based on the alleged violation of his rights and privileges protected by the Fifth Amendment. No independent Fourth or Sixth Amendment claims were argued to or discussed by the Alabama Court of Criminal Appeals in its decision on the appeal of petitioner's conviction. *See Waldrop v. State,* 459 So.2d 953 (Ala.Crim.App.1983).

 The Petitioner raised independent Fourth and Sixth Amendment claims in his petition for writ of error coram nobis filed with the trial court. However, the Alabama Court of Criminal Appeals erroneously declared these claims barred from collateral review because they were previously raised and decided on direct appeal. *Waldrop v. State,* 523 So.2d 475, 496 (Ala.Crim.App. 1987). When the petitioner appealed the

14. Since the "prejudice" prong of the test cannot be satisfied, there is no need to address whether petitioner can show cause for his default.

15. *Arizona v. Roberson* applies only to those cases not final prior to its decision on June 15, 1988. Petitioner's case became final on April 15, 1985, when the United States Supreme Court denied his petition for writ of certiorari. In *Butler v. McKellar,* the Court specifically held that *Arizona v. Roberson* announced a "new rule," not retroactively applicable. *See Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989).

denial of the error coram nobis petition, he abandoned the independent Fourth and Sixth Amendment claims. Thereafter, the claims were presented as ineffective assistance of counsel claims in violation of the Sixth Amendment right to the assistance of counsel.[16]

The procedural ground upon which the appellate court denied review was incorrect in that the Fourth and Sixth Amendment claims were *not* raised on direct appeal. The only challenge made to the admissibility of the confession on direct appeal was based on the Fifth Amendment. The court was correct, however, in refusing to review the claims, but for the wrong reason. The court should have denied review because the claims could have been raised at trial and on direct appeal, but were not. *See Magwood v. Smith,* 791 F.2d 1438, 1444 (11th Cir.1986). For the purposes of this action, either holding constitutes a procedural default which precludes review by a federal habeas court. *See Harris v. Reed,* 489 U.S. 255, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) (last state court expressly states its judgment rests on a state procedural ground); *Collier v. Jones,* 910 F.2d 770 (11th Cir.1990) (claim never presented to state court); *Burger v. Zant,* 984 F.2d 1129 (11th Cir.1993).

Additionally, *Collier v. Jones* teaches that the claims have been procedurally defaulted. The Fourth and Sixth Amendment challenges to the confession, in fact, were presented to the coram nobis court and denied. Petitioner then abandoned the claims on appeal from denial of coram nobis, making them comparable to unexhausted claims never presented to any state court. *See Collier v. Jones, supra; Burger v. Zant, supra.* Because the two-year limitation set forth in Alabama Rule of Criminal Procedure 32.2(c)

now bars them from consideration by a state court, they are also procedurally barred from habeas review.

As discussed previously, a procedural default can be excused if the petitioner is able to show cause for failing to raise the claim and actual prejudice arising from the default. Again, the petitioner has not shown cause, and cannot show prejudice because the claims are meritless, nor does the "fundamental miscarriage of justice" exception require federal review. *See* Part VI, *infra,* generally for a discussion of the "cause and prejudice" and "fundamental miscarriage of justice" exceptions to procedural default.

### (1) Fourth Amendment Claim

As with the Petitioner's Fifth Amendment claim, his Fourth Amendment claim has been presented with some variation along the way. Initially, petitioner argued that he was unlawfully detained at the Talladega County Jail without probable cause and without the benefit of an appearance before a judicial official and any statement or confession made by him was "tainted" by the unlawful detention and thereby inadmissible.[17] Later, recognizing that *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), would bar federal review of his Fourth Amendment claim, petitioner stated that he no longer seeks to raise an independent Fourth Amendment claim. *See Petitioner's Memorandum of Law in Opposition to Respondent's Motion for Summary Judgment,* n. 3. Petitioner has restructured his claim and now asserts that the state's egregious violation of his Fourth Amendment rights was " 'so offensive to a civilized system of justice that they must be condemned under the Due Process clause of the Four-

---

**16.** Petitioner claimed that his trial counsel was ineffective because he failed to file a motion to suppress the confession based on Fourth and Sixth amendment grounds. The ineffectiveness claim and the independent claims are separate and distinct issues to which different standards apply. *See Atkins v. Singletary,* 965 F.2d 952, 961 (11th Cir.1992) ("This ineffectiveness claim differs from the issue whether Atkins knowingly waived his *Miranda* rights.") *Washington v. Murray,* 952 F.2d 1472, 1483 n. 9 (4th Cir.1991). For purposes of procedural default, the presenta-

tion of an ineffective assistance of counsel claim involving Fourth and Sixth Amendment issues cannot substitute for a claim charging a violation of Fourth and Sixth Amendment rights.

**17.** Evidence acquired either directly or indirectly as a result of an illegal seizure or arrest is not admissible in a criminal proceeding against the victim of the seizure as proof of guilt. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

**900**

teenth Amendment.' *Miller v. Fenton,* 474 U.S. 104, 108, 106 S.Ct. 445, 448, 88 L.Ed.2d 405 (1985)." *Id.* An arrest is a deprivation of liberty that may be challenged under the Fourteenth Amendment without reference to the Fourth Amendment. However, for purposes of analysis, the Fourth Amendment is a more specific regulation and if a case cannot be made under the principles of the Fourth Amendment, the petitioner may not alternatively appeal to the principles of due process. *Patton v. Przybylski,* 822 F.2d 697 (7th Cir.1987).

▮▮▮▮ Petitioner argues that his Fourth Amendment rights were violated because he was jailed for a period of four months without appearance before a judicial officer. Under the Fourth Amendment, a fair and reasonable determination of probable cause must be made as a condition to any significant pretrial restraint on liberty. *Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975). The probable cause determination must be made either before or promptly after the detention. *Id.* at 125, 95 S.Ct. at 869. If probable cause has not been predetermined, a preliminary hearing must be held by a judicial officer to ascertain whether there is probable cause to detain the person. This probable cause requirement may be satisfied prior to an arrest, thereby eliminating the need for a preliminary examination. "Since the probable cause standard for pretrial detention is the same as that for arrest, a person arrested pursuant to a warrant issued by a magistrate on a showing of probable cause is not constitutionally entitled to a separate judicial determination that there is probable cause to detain him pending trial." *Baker v. McCollan,* 443 U.S. 137, 143, 99 S.Ct. 2689, 2694, 61 L.Ed.2d 433 (1979).

▮▮▮ The petitioner was in custody in the State of Alabama pursuant to a warrant issued by the appropriate official of Calhoun County, Alabama, after a showing of probable cause, charging the petitioner with receiving stolen property. Even though the petitioner was transferred to the Talladega County Jail, his confinement was nevertheless pursuant to the Calhoun County war-

rant. For purposes of the Fourth Amendment, the situs of custody makes no difference as long as the probable cause requirements are satisfied. Because the probable cause determination had been made prior to his arrest and extradition to Alabama, the petitioner was not entitled to a post-arrest probable cause hearing. He was later indicted for murder in Talladega County, Alabama which eliminated the need for a preliminary hearing on the subsequent murder charge. Therefore, the court concludes that the petitioner was lawfully detained after sufficient probable cause was shown in order to obtain the arrest warrant, and no Fourth Amendment violation occurred as a result of petitioner's detention in the Talladega County Jail.[18] Since the petitioner is unable to show a Fourth Amendment violation, his Fourteenth Amendment claim must necessarily fail. *See Patton, supra.*

*(2) Sixth Amendment*

▮▮▮ Petitioner also claims a violation of his Sixth Amendment right to counsel. The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defense." The Sixth Amendment is violated if, once the right has attached, the defendant is questioned by the police outside the presence of an attorney, and any statements so obtained are inadmissible at trial. *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). The protections of this amendment are often confused with the right to counsel found in the context of the Fifth Amendment protection against self-incrimination. The Fifth Amendment right to counsel is not directly conferred by the Constitution, but rather is a judge-made device to assure that the express constitutional right, the right against compulsory self-incrimination, is not infringed. The Fifth Amendment right to counsel is one of the prophylactic measures established in *Miranda v. Arizona,* designed to counteract the "inherently compelling pressures" of custodial interrogation. An invocation of the Fifth Amendment right to counsel indicates that the person invoking the privilege desires to

**18.** Having decided that the detention was lawful, the issue of taint need not be discussed.

have an attorney assist him in dealing with custodial interrogation by the police. The Sixth Amendment right to counsel is designed to protect the defendant at judicial proceedings when "the government has committed itself to prosecute, and the adverse positions of the government and defendant have solidified." *United States v. Gouveia,* 467 U.S. 180, 189, 104 S.Ct. 2292, 2298, 81 L.Ed.2d 146, 155 (1984) (quoting *Kirby v. Illinois,* 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972)). It is not until this point that the defendant finds himself "immersed in the intricacies of substantive and procedural criminal law." *Id.* An invocation of the Sixth Amendment right to counsel indicates a desire for the assistance of an attorney during actual judicial proceedings with respect to a particular alleged crime. In other words, the Sixth Amendment right to counsel and the right to counsel under the *Miranda/Edwards* rule are two separate and distinct concepts protecting separate and distinct interests. The invocation of one is not to be construed as an invocation of the other. *McNeil v. Wisconsin,* 501 U.S. 171, 174–77, 111 S.Ct. 2204, 2206–08, 115 L.Ed.2d 158, 166–67 (1991).

■■■ As the language of the amendment suggests, the protection of the Sixth Amendment extends to an *accused* in a *criminal prosecution.* The right "does not attach until a prosecution is commenced, that is, 'at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing or arraignment.'" *Id.* (quoting *United States v. Gouveia,* 467 U.S. 180, 189, 104 S.Ct. 2292, 2298, 81 L.Ed.2d 146, 155 (1984)); *Kirby v. Illinois,* 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972); *Stokes v. Singletary,* 952 F.2d 1567 (11th Cir.1992).

■■■ Moreover, another distinction between the Fifth and Sixth Amendment is that the Sixth Amendment right to counsel is "offense-specific." *McNeil,* 501 U.S. at 175, 111 S.Ct. at 2207, 115 L.Ed.2d at 166.[19] The Supreme Court explained the rationale for

limiting the Sixth Amendment right to counsel to specific pending charges:

> The police have an interest in the thorough investigation of crimes for which formal charges have already been filed. They also have an interest in investigating new or additional crimes. Investigations of either type of crime may require surveillance of individuals already under indictment. Moreover, law enforcement officials investigating an individual suspected of committing one crime and formally charged with having committed another crime obviously seek to discover evidence useful at a trial of either crime. In seeking evidence pertaining to pending charges, however, the Government's investigative powers are limited by the Sixth Amendment rights of the accused. To allow the admission of evidence obtained from the accused in violation of his Sixth Amendment rights whenever the police assert an alternative, legitimate reason for their surveillance invites abuse by law enforcement personnel in the form of fabricated investigations and risks the evisceration of the Sixth Amendment right recognized in Massiah. On the other hand, to exclude evidence pertaining to charges as to which the Sixth Amendment right to counsel had not attached at the time the evidence was obtained, simply because other charges were pending at the time, would unnecessarily frustrate the public's interest in the investigation of criminal activities. Consequently, incriminating statements pertaining to pending charges are inadmissible at the trial of those charges.... [FN16]

> ―――――
> [FN16] Incriminating statements pertaining to other crimes, as to which the Sixth Amendment right has not yet attached, are, of course, admissible at a trial of those offenses.

*Maine v. Moulton,* 474 U.S. 159, 180, 106 S.Ct. 477, 489, 88 L.Ed.2d 481 (1985).

■■■ When the petitioner gave his October 18, 1982, statement, he was in custody in Alabama pursuant to the receiving stolen-

---

**19.** Retroactive application of *McNeil* is entirely proper as the opinion was based on existing law and does not constitute a new constitutional rule under the principles of *Teague v. Lane,* 489 U.S.

288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). *Williamson v. Parke,* 963 F.2d 863, 867 (6th Cir.1992).

property warrant, the only offense for which a formal charge had been made. It is undisputed that petitioner's Sixth Amendment right to counsel had attached as to the Calhoun County stolen-property charge. However, since the Sixth Amendment right to counsel is offense-specific, it had not attached as to the Talladega County murder investigation because he had not yet been charged with murder.[20] Any questioning relating to the murder investigation falls within the interest the Supreme Court sought to safeguard in *Maine v. Moulton*—the ability of law enforcement officers to investigate new and additional criminal activities through the questioning of criminal defendants.

■ The petitioner argues that the Sixth Amendment right to counsel attached at an earlier stage when he was targeted by the police as a suspect in the Donahoo murder. Relying on the decision in *DeAngelo v. Wainwright*, 781 F.2d 1516 (11th Cir.1986), petitioner maintains that the state's investigation of his involvement in the murder had surpassed the investigatory phase and was well within the accusatory phase, and that his Sixth Amendment rights had attached. While the *DeAngelo* court suggested that the right to counsel may attach even though no accusatory pleading is pending when the investigation focuses on one particular person, it based the possibility on language found in the case of *Escobedo v. Illinois*, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964). However, as the Eleventh Circuit recognized, *Escobedo* is viewed "as an aberration in an otherwise unbroken chain of precedent which holds that a defendant does not have a constitutional right to counsel until adversary judicial proceedings are brought against him." *DeAngelo v. Wainwright*, 781 F.2d at 1519. Additionally, *DeAngelo* involved a confession surreptitiously obtained from a hospital patient by an informant wearing a hidden microphone. It is this type of conduct that the Eleventh Circuit condemns when it refers to the evasion of constitutional protections "by means of trickery or circuitous machinations." *DeAngelo*, 781 F.2d at 1520 n. 2. There was no such conduct involved

when the petitioner gave his statements to the police. No wire taps, hidden tape recorders, or other forms of subterfuge were used. The petitioner was well aware that he was giving a formal statement to the police which was being tape recorded. Moreover, the United States Supreme Court made it clear in *McNeil* that the Sixth Amendment right to counsel does not attach until a prosecution is commenced, *McNeil*, 501 U.S. at 175–77, 111 S.Ct. at 2207–08, 115 L.Ed.2d at 167, plainly undermining any Sixth Amendment foundations underlying *DeAngelo*.

■ Some circuits have recognized an exception to the "offense-specific" rule set out in *McNeil*. These courts have interpreted the Supreme Court's language and disposition in *Maine v. Moulton* to mean that the Sixth Amendment (not the Fifth Amendment) prohibits interrogation about an uncharged offense if it is "inextricably intertwined" or "extremely closely related" to the charged offense. *United States v. Carpenter*, 963 F.2d 736 (5th Cir.1992); *see United States v. Hines*, 963 F.2d 255 (9th Cir.1992); *United States v. Cooper*, 949 F.2d 737 (5th Cir.1991). The petitioner in the instant case was charged in Calhoun County with receiving stolen property, the stolen property being the five-carat diamond ring stolen from the victim, Macon Donahoo. The uncharged offense, about which the petitioner was questioned and for which petitioner was ultimately tried and convicted, was the murder of Mr. Donahoo. Relying on the rationale in *Carpenter*, *Hines*, and *Cooper*, the court concludes that these two offenses do not fall within the "closely related" exception. The two crimes involve totally different conduct, even though some of the same evidence could be used in the prosecution of both. *See Cooper*, 949 F.2d at 744. The two crimes occurred in two different counties at different times. *See Hines*, 963 F.2d at 257. The stolen property and murder charges are separate and distinct offenses, therefore the Sixth Amendment did not bar the police from questioning the petitioner about the murder.

■ Petitioner also contends that the State intentionally delayed by four months

**20.** This action challenges the conviction in Talladega County for the murder of Macon Donahoo, therefore the only Sixth Amendment right at issue here relates to the murder charge.

bringing a formal charge against him for the murder in order to suspend his Sixth Amendment right to counsel, and that the intentional and unnecessary delay invoked the protections of the Sixth Amendment. This argument was rejected in the case of *Flittie v. Solem,* 775 F.2d 933 (8th Cir.1985), the case cited by the petitioner in support of this proposition. Likewise this court declines to adopt the principle, and concurs with the United States Supreme Court's reasoning on this matter:

> There is no constitutional right to be arrested. The police are not required to guess at their peril the precise moment at which they have probable cause to arrest a suspect, risking a violation of the Fourth Amendment if they act too soon, and a violation of the Sixth Amendment if they wait too long. Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, a quantum of evidence which may fall far short of the amount necessary to support a criminal conviction.

*Hoffa v. United States,* 385 U.S. 293, 310, 87 S.Ct. 408, 417, 17 L.Ed.2d 374 (1966). *See also United States v. Alvarez,* 812 F.2d 668, 670 n. 5 (11th Cir.1987) (citing with approval *United States v. Lovasco,* 431 U.S. 783, 791– 92, 97 S.Ct. 2044, 2049–50, 52 L.Ed.2d 752 (1977) (Requiring the immediate filing of charges "could make obtaining proof of guilt beyond a reasonable doubt impossible by causing potentially fruitful sources of evidence to evaporate before they are fully exploited."); *United States v. Watson,* 423 U.S. 411, 431, 96 S.Ct. 820, 831, 46 L.Ed.2d 598 (1976) (Powell, J., concurring) ("Good police practice often requires postponing an arrest, even after probable cause has been established, in order to place the suspect under surveillance or otherwise develop further evidence necessary to prove guilt to a jury.").

Detective Surrett testified that while the petitioner was under investigation for the Donahoo murder, there was insufficient evidence to support a finding of probable cause for a murder warrant until after the petitioner confessed. Even if probable cause had been established prior to the confession, the police were under no duty to charge the petitioner and to cease their investigation before developing evidence necessary to support a conviction. Consequently, the fact that petitioner was not formally charged until the indictment was filed on December 17, 1982, does not give rise to a constitutional violation.

■ The court rejects the petitioner's argument that his Sixth Amendment right to counsel materialized when he should have been, but was not, brought before a judicial officer on September 10, 1982, the date of his scheduled preliminary hearing on the receiving stolen property charge in Calhoun County. It is suggested that the police deliberately isolated the petitioner in the Talladega County Jail in order to prevent him from obtaining the assistance of court-appointed counsel. The undisputed record shows that the Petitioner wanted to be transferred to the Talladega County Jail in order to be near his family and in order to influence the murder investigation. It was petitioner's plan to lessen his culpability and to increase that of his co-defendants by cooperating with the Talladega County police. According to testimony, the petitioner was not isolated. He remained in contact with his family and was not cut off from the general public. He was repeatedly advised of his right to court-appointed counsel while housed in the Talladega County Jail. As to the scheduled hearing in Calhoun County, testimony revealed that the Calhoun County authorities were well aware of petitioner's location in the Talladega County Jail and no requests were made to return the petitioner to Calhoun County for any court appearances. The petitioner never requested that he be returned to Calhoun County. Hence, petitioner has failed to demonstrate any deliberate isolation on the part of the State.

■ Furthermore, even if the evidence showed that Talladega and Calhoun County officials colluded to fail to bring petitioner to the September, 1982 preliminary hearing, only his Sixth Amendment right to counsel on the stolen-property charge would be implicated. Because petitioner had not then been charged in the murder of Macon Donahoo, no Sixth Amendment right to counsel

had attached with respect to the murder investigation. Thus, even if there was an intentional scheme to "isolate" petitioner, none of his federal constitutional rights were violated in a way affecting the outcome of this case.

It follows, there can be no Sixth Amendment violation relating to the admission of petitioner's statement at his murder trial because no such protection was available to him at the time the statement was made.

The court holds, in summary, that petitioner's Fourth and Sixth Amendment challenges to his confessions are procedurally barred from habeas review and, not only has he failed to show "cause" for the default, the claims are meritless so that he has suffered no "prejudice." Absent a showing of cause *and* prejudice, the procedural default doctrine precludes review of these claims.[21] *See Wainwright v. Sykes, supra; Sochor v. Florida,* 504 U.S. ——, 112 S.Ct. 2114, 119 L.Ed.2d 326 (1992). Furthermore, the confessions themselves show that petitioner can make no "colorable showing of factual innocence" in order to bring himself within the fundamental-miscarriage-of-justice exception to the rule. *Murray v. Carrier,* 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986); *Sawyer v. Whitley,* 505 U.S. ——, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992). Being procedurally barred, therefore, the Fourth and Sixth Amendment claims do not support habeas relief.

### IV. Ineffective Assistance Of Counsel

Beginning at page 12 of the Amended Petition for writ of habeas corpus, petitioner sets out his claims for relief based upon the alleged ineffective assistance of his trial and appellate counsel. From paragraphs 49 through 63 of the petition, he explains the factual and legal bases of the various instances of ineffectiveness. Those claims appear to be the following:

1. Trial counsel failed to seek to rehabilitate and save two jurors stricken for cause who had expressed conscientious objections to the death penalty. (Paragraph 49).

2. Trial counsel failed to request individual voir dire during jury selection or sequestration of the jury during trial. (Paragraph 50).

3. During the *penalty* phase of the trial, defense counsel elicited questions from a witness which allowed the prosecution to reveal the existence of a plea-bargain agreement in relation to petitioner's 1975 murder convictions. (Paragraph 52(a)).

4. During the *penalty* phase, defense counsel failed to challenge the constitutional validity of petitioner's 1975 murder convictions, which were used to establish one of the aggravating circumstances making him eligible for the death penalty in this case. (Paragraph 52(b)(i-iv)).

5. Defense counsel failed to explain to petitioner his right to testify at the penalty phase of trial and to offer mitigating evidence. (Paragraph 53).

6. Defense counsel failed to adequately investigate and present mitigating evidence during the penalty phase relating to petitioner's violent and abusive childhood and family background. (Paragraphs 55-57).

7. Defense counsel failed to adequately investigate and present mitigating evidence relating to the petitioner's mental instability during the penalty phase. (Paragraphs 58-59).

8. Defense counsel failed to adequately investigate and present during the penalty phase mitigating evidence relating to neurological damage petitioner had suffered as the result of a gunshot wound to the head. (Paragraph 60).

9. Defense counsel failed to adequately investigate and present during the penalty phase mitigating evidence relating to a polygraph examination of the petitioner which indicated that he had not participated in the murder. (Paragraph 61).

10. Defense counsel failed to request a hearing on the accuracy of allegedly prejudicial information contained in a presentence investigation report made available to the sentencing judge on March 22, 1983, although counsel did object to the report and

---

**21.** *See generally* Part VII, *infra,* for a discussion of procedural default and "cause and prejudice."

ask the court not to consider statements in the report. (Paragraph 62).

11. Petitioner received ineffective assistance of counsel on direct appeal because (1) no cases were cited in petitioner's initial appellate brief; (2) appellate counsel failed to raise as an issue on appeal the trial court's failure to appoint a defense psychiatrist; and (3) appellate counsel failed to raise as an issue on appeal the trial court's erroneous consideration of prejudicial hearsay in the presentence report. (Paragraph 63).

## A. General Principles

The Supreme Court's two leading cases on the Sixth Amendment right to the effective assistance of counsel are *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and *United States v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). Those two cases summarize a long line of Sixth Amendment cases dealing with the right to counsel and the right to competent and effective counsel. In *Strickland v. Washington,* the court formulated the test for assessing during habeas proceedings whether the representation provided by an attorney during a criminal trial constituted "effective" representation. The court wrote:

> A convicted defendant's claim that counsel's assistance was so defective as to require a reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted in a breakdown of the adversary process that renders the result unreliable.

*Strickland v. Washington,* 466 US. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693

(1984). Thus, the test to be applied is a two-pronged test, attempting to measure *both* the competence of counsel's performance and whether deficiencies in that performance caused actual harm to the defense.

 On the first prong of that test—counsel's performance—the Supreme Court explained that reviewing courts must be deferential to the decisions made by counsel. The court explained:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. [Citation omitted]. A fair assessment of an attorney's performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenges conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

*Strickland v. Washington, supra* at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 695 (*quoting Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 164, 100 L.Ed. 83 (1955). The fundamental purpose of counsel under the Sixth Amendment is to make sure that the Government's evidence undergoes the testing provided by the adversarial system. The Sixth Amendment right to the effective assistance of counsel is violated only when counsel's performance causes a breakdown in the adversarial nature of the proceeding. Whether particular decisions made by counsel are professionally reasonable must be assessed in the context of all the circumstances, not the least of which are the defendant's own statements and actions upon which the attorney must rely in deciding

whether to pursue particular lines of investigation or defense.

Even if the court determines that counsel's conduct with respect to any particular error or omission was professionally unreasonable, the Sixth Amendment right to the effective assistance of counsel is violated only if the defendant is able to establish the second prong of the test, that the defense actually suffered due to the error or omission. Although there are circumstances under which prejudice to the defense is presumed,[22] more commonly, "the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington, supra* 466 U.S. at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.* In making the assessment of prejudice, the habeas court is required to presume that the judge and jury acted according to law except when there is a challenge to the judgment on the basis that there was insufficient evidence to support the conviction. Except in those limited circumstances described in *Strickland v. Washington,* prejudice cannot be presumed merely from the circumstances of the appointment, the shortness of time allowed defense to prepare, or the relative inexperience of counsel. *See United States v. Cronic, supra.* The defendant must identify specific errors or omissions allegedly committed by counsel during the trial, must establish that those errors or omissions were professionally unreasonable, and that the identified errors or omissions resulted in actual harm to the defense in the sense that there exists a reasonable probability that the outcome of the proceeding would have been different had the errors not occurred.

## B. Death–Scrupled Jurors

The first specific error or omission asserted by petitioner is that his trial counsel failed to seek to rehabilitate and preserve two jury veniremen stricken for cause who had expressed objections to the death penalty. At paragraph 49 of the Amended Petition for Habeas Corpus Relief, he alleges the following:

> From the start of the trial, defense counsel failed to take reasonable steps to insure that petitioner received a sentence less than death. During jury selection, two prospective jurors, Willie J. Best and Melissa E. Britt, stated that they had conscientious objection to the death penalty. R. 8–9. District Attorney Rumsey elicited, through leading questions, admissions by both jurors that they would vote automatically against the death penalty regardless of the evidence. R. 9–11. Defense counsel made no effort to rehabilitate these jurors. He asked no questions of them, and he did not oppose the State's successful challenges for cause. R. 8–11, 55.

*See Second Amended Petition,* at p. 13. While not pled in precisely these terms, this claim was fairly presented to the state courts in the petition for writ of error coram nobis. There, alleged in the context of counsel's failure to file certain motions, petitioner alleged that his attorney was ineffective because he failed to file a motion "challenging the court's striking of prospective jurors because of their inability to consider the death penalty." *See Tab R–41,* at p. 12. Although no specific jurors were identified, the petition for writ of error coram nobis argued that the exclusion of such jurors tended to create "juries that are guilt-prone and underrepresentative in a Sixth Amendment sense" and that "the exclusion of such jurors at the guilt phase of a bifurcated capital trial deprives a defendant of the constitutional right to a fair jury and one drawn from a representative cross-section of the community." *See Tab R–41,* pp. 12–13.[23] On appeal from denial of

---

**22.** The actual or constructive denial of counsel altogether results in a presumption of prejudice. Also, an attorney burdened by an actual conflict of interest results in a similar but somewhat more limited presumption of prejudice. *See Strickland v. Washington,* 466 U.S. 668, 692, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674 (1984); *Cuyler*

*v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980).

**23.** The court notes that there is a subtle difference between the essence of the claim asserted in the coram nobis petition and that being argued before this court. In the coram nobis petition, petitioner cited the Eighth Circuit case of *Grigsby*

coram nobis relief, this and all other issues of ineffectiveness alleged in the coram nobis petition were expressly reincorporated in the petitioner's appellate brief, although they were not argued. In that sense, the issues were not abandoned, but nor were they pressed. The court concludes, therefore, that the issue of ineffectiveness relating to counsel's failure to seek to preserve jurors Britt and Best is not procedurally barred.

██ Even though not procedurally barred, the claim is meritless. The trial record reflects that during selection of the jury the trial court read off a long list of circumstances that would disqualify jurors, and then asked any jurors who might be disqualified under that list to come forward. *See Tab R–8.* Juror Best came forward and said, "Concerning my relationship, I don't believe in capital punishment or circumstantial evidence." Additionally, juror Britt came forward and said, "Because of my religion, I don't believe in capital punishment." Later, both of these jurors were more extensively questioned. At page 8 of the Trial Record, the following colloquy occurred:

MR. RUMSEY (District Attorney): Do any of you ladies or gentlemen have a religious or moral conviction against passing judgment on your fellow man? All right, Mr. Best, and your name, please mam?

JUROR: Melissa Britt.

MR. RUMSEY: Let me ask you, when you say that you have a personal, moral, or religious conviction, and I'll give this question to both of you at the same time. Are you telling us that regardless of what the evidence showed, that you would be unable to pass judgment on your fellow man, regardless of what the evidence showed?

JUROR WILLIE BEST: As to concerning capital punishment.

*v. Mabry*, 758 F.2d 226 (8th Cir.1985) (en banc), which dealt with the effect of the exclusion of jurors opposed to the death penalty, not upon the decision whether a defendant should receive death, but upon the more fundamental question of the defendant's guilt or innocence. Thus, in a way, the coram nobis petition argued that the removal of death-qualified jurors impacted upon the guilty verdict, not just the penalty recommendation.

MR. RUMSEY: I am going to get to that in just a moment. Let me go to religious, moral, and personal conviction at this time. Would you, Ms. Britt, regardless of what the evidence—the evidence that came to you from the witness stand, regardless of what it was, you couldn't convict anybody?

JUROR MELISSA BRITT: I could, but I couldn't send somebody to murder.

REPORTER: What did she say?

MR. RUMSEY: She said she could but she couldn't send somebody to murder. Are you talking about the electric chair?

JUROR MELISSA BRITT: Yes.

MR. RUMSEY: Mr. Best?

JUROR WILLIE BEST: The same answer.

\* \* \* \* \* \*

[MR. RUMSEY]: Are any of you opposed or conscientiously opposed to capital punishment? Mr. Best and Ms. Britt. Let me ask you this, first of all, Mrs. Britt, have you held that view for a long time?

MRS. BRITT: Yes.

MR. RUMSEY: And of course, there is nothing that I could say or anybody could say that would change you from that view?

MRS. BRITT: No.

MR. RUMSEY: Let me ask you this. Would you automatically vote against the imposition of the death penalty without regard to any evidence that might be developed in the trial of this case, if you were selected as a juror?

MRS. BRITT: Repeat the question.

MR. RUMSEY: I will read it to you word for word, but it very important. As to whether or not you would automatically

In the habeas corpus petition, petitioner alleges that the removal of death-qualified jurors impacted the penalty he received; there is no assertion that the striking of death-qualified jurors affected the question of guilt or innocence. This is subtly different from the argument advanced in the coram nobis petition. Nevertheless, they are sufficiently similar to amount to a fair presentation of the claim for purposes of habeas exhaustion.

vote against the imposition of the death penalty, without regard to any evidence that might be developed in the trial of this case, if you were selected as a juror.

JUROR BRITT: I would vote against the death penalty.

MR. RUMSEY: We challenge her for cause, Your Honor. You would automatically vote against the death penalty and you are irrevocably committed to that position, regardless of what evidence might come to you from the witness stand?

JUROR BRITT: Yes.

MR. RUMSEY: We challenge for cause.

THE COURT: All right.

MR. RUMSEY: Now, Mr. Best, the same question. I believe you said that you are conscientiously opposed to the death penalty.

JUROR WILLIE BEST: Yes, sir.

MR. RUMSEY: And I assume that you have held that view for a long time?

JUROR BEST: Yes.

MR. RUMSEY: And nothing that I could say or anybody here could say, would get you to change that view?

JUROR BEST: That is right.

MR. RUMSEY: And I'll ask you this question. Would you automatically vote against the imposition of the death penalty without regard to any evidence that might be developed in the trial of this case, if you were selected as a juror?

JUROR BEST: I would vote against the death penalty.

MR. RUMSEY: And so you are irrevocably committed to vote against the death penalty, regardless of what evidence should come forth from that witness stand?

JUROR BEST: Yes.

MR. RUMSEY: We would challenge Mr. Best for cause.

THE COURT: Granted.

*See Tab R–8,* pp. 8–11.

While we may quibble over whether defense counsel should have attempted to persuade these jurors that, despite what they had said, they were not unalterably opposed to the death penalty, counsel was not ineffective in a constitutional sense for declining to do so. The responses given by both jurors indicated that they were irrevocably and unalterably opposed to the death penalty to the extent that they would automatically vote against the imposition of the punishment. As such, the jurors were properly excludable under the rule in *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), even without the clarification provided subsequently in *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). Following *Witherspoon,* lower courts have concluded that a juror is properly excludable from a capital-punishment trial if the juror makes unmistakably clear that he would automatically vote against the imposition of the punishment or that his attitude toward the death penalty would prevent him from making an impartial decision as to the guilt of the defendant. *See Stephens v. Kemp,* 846 F.2d 642 (11th Cir.1988).

Because both jurors Best and Britt made unmistakably clear that they would vote automatically against the imposition of the death penalty, they were properly excludable under *Witherspoon* and *Stephens.* Given the strength of their response to questioning by the prosecutor, counsel's decision not to attempt to rehabilitate them, because to do so appeared to be fruitless, was a professionally-reasonable decision and did not amount to ineffectiveness of counsel.

### C. *Voir Dire and Sequestration*

Petitioner's second specification of ineffectiveness of counsel asserts that counsel should have requested individual voir dire of prospective jurors during jury selection and should have requested sequestration of the jury during trial.[24] Whether construed as

24. Apparently, the State does not assert that this claim of ineffectiveness is either unexhausted or procedurally barred. Paragraph 31 of the respondents' Answer to the Amended Petition For Writ of Habeas Corpus deals with various allega-

tions of ineffectiveness, contending that they were not previously asserted and thus are procedurally barred. Not included among those is petitioner's assertion that his attorney was ineffective for failing to seek an individual voir dire

two separate specifications of attorney error, or as one, the claim is meritless. First, it is apparent from the face of the trial record that petitioner himself waived sequestration of the jury. At page 38 of the trial transcript, the following discussion is reflected:

BY THE COURT: Bring the defendant up. Mr. Waldrop, we have been discussing, your attorneys, and the district attorney. In fact, your attorney was the one that brought it up first. Do you understand that this is a capital felony that you're charged with?

THE DEFENDANT: I do.

BY THE COURT: And if you require—not if you require—but the law requires that I keep the jury together from now until this trial is concluded, unless you consent on the record and the State consents, to allow the jury to separate and go home. Now do you understand that?

THE DEFENDANT: Yeah.

BY THE COURT: Do you consent to the jury separating until this trial is concluded?

THE DEFENDANT: Yes, sir.

BY THE COURT: At the time when we take breaks, and when they go home at night and when we take a recess at noon?

THE DEFENDANT: I want them to go home. I want them to.

BY THE COURT: All right. And as his attorney, Mr. Fannin, do you concur with that?

MR. FANNIN: Yes, sir, Mr. Pitts and myself, both.

of prospective jurors and for failing to seek sequestration of the jury.

**25.** The court has concluded that it is not necessary to hold a separate evidentiary hearing in connection with this habeas petition in order to allow the petitioner to offer additional evidence with respect to claims previously pled in the coram nobis petition. Petitioner was granted a full and fair opportunity to litigate all of those claims at the time of the coram nobis hearing, and his failure to present evidence on those claims at that time bars him from doing so now unless he can show cause and prejudice excusing his failure to offer the evidence at the coram nobis hearing. In *Keeney v. Tamayo–Reyes,* 504 U.S. ——, 112 S.Ct. 1715, 118 L.Ed.2d 318

*See Tab R–8,* p. 38. Plainly, after having the right to require the sequestration of the jury explained to him, the petitioner himself indicated that he wanted the jury to be allowed to go home at night during the trial. Given that expression by the petitioner, it cannot be said that defense counsel's concurrence was professionally unreasonable. Moreover, no evidence was offered at the state coram nobis hearing to indicate that the failure to sequester the jury resulted in any prejudice to the petitioner. There was no evidence that the jury was exposed to coercion or inappropriate information that may have affected their verdict. In short, therefore, even if defense counsel's decision was professionally unreasonable, petitioner has not shown a reasonable probability that the outcome of his trial or sentencing procedure would have been different had his attorneys insisted upon sequestration of the jury.

Similarly, petitioner has made no showing that there is a reasonable probability that the outcome of his trial or sentencing procedure would have been different if his attorney had insisted upon an individualized voir dire of prospective jurors. Despite raising this claim in his coram nobis petition, no evidence was offered during that hearing to establish that any juror was affected by the en masse voir dire of the entire venire. Absent some showing that there is a reasonable probability that the outcome of the proceeding would have been different had such an individualized voir dire occurred, it cannot be said that counsel's failure to request such a voir dire resulted in prejudice to the defense. *See Strickland v. Washington, supra.*[25]

(1992), the United States Supreme Court applied the long-recognized "cause and prejudice" standard "to excuse a state prisoner's failure to develop material facts in state court...." The holding in *Keeney* makes plain that a habeas petitioner is not entitled to a separate evidentiary hearing in a habeas action when he has had the opportunity to adequately develop material facts in a state-court proceeding but has failed to do so unless he can show "cause and prejudice" for his failure to properly develop those facts in the state-court proceeding.

As noted earlier in the text, petitioner received a full and fair hearing on his coram nobis petition. Fourteen witnesses testified and the transcript of the hearing covered 444 pages. He has

## D. *Plea Bargain/Judicial Leniency*

■ Petitioner's third allegation of ineffective assistance of counsel argues that his defense counsel's performance during the penalty phase of his trial was professionally unreasonable because counsel asked certain questions of a witness which allowed the prosecution to then reveal that petitioner had plea-bargained his 1975 murder convictions. At paragraph 52(a) of the second amended petition, petitioner contends that these events allowed the prosecution to argue that petitioner already had been the beneficiary of undue judicial leniency, which he should not receive again.

■ Respondents have alleged that this particular claim of ineffective assistance of counsel is procedurally barred from review because it was not raised during the 1985 coram nobis proceeding. While the coram nobis petition alleged that counsel were ineffective because they failed to properly investigate and present evidence of potential mitigating circumstances, it does not raise the specific allegation set forth here.[26] Nor does the brief on appeal from denial of coram nobis specifically raise any issue regarding the prosecution's ability to refer to the 1975 plea bargain. In sum, this particular designation of counsel error has never been fairly presented to any state court for consideration or resolution. Nor is there a state remedy now available to the petitioner inasmuch as the two-year limitation provided in Alabama Rule of Criminal Procedure 32.2(c) has expired.

■ By failing to present this particular claim of ineffectiveness of counsel within the two-year limitation,[27] Waldrop has procedurally defaulted the claim. He has not shown cause and prejudice that would excuse this procedural default under *Wainwright v. Sykes, supra.* Indeed, it seems unlikely that he would be able to do so inasmuch as he was represented by different attorneys in 1988 when he did file a Rule 20 challenge to his conviction and death sentence. The only explanation that could be offered for the failure to raise this particular allegation would involve either an oversight or an intentional decision by those attorneys not to assert this claim, neither of which is an objective obstacle external to the defense, sufficient to be "cause." *See Murray v. Carrier,* 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986).

■ Notwithstanding the court's conclusion that this particular specification of attorney error is procedurally barred, it also is meritless. To the extent that petitioner argues that defense counsel's questions opened the door to allow the prosecution to refer to his 1975 plea bargain, the record reflects that the only questions asked by defense counsel were whether the 1975 convictions carried 15–year sentences and whether those sentences were concurrent or consecutive. *See Tab R–20,* p. 14. The fact that the prosecutor thereafter elicited from the witness that the 15–year sentences were pursuant to a plea agreement indicates nothing professionally unreasonable about defense counsel's decision to bring out the concurrent nature of the sentences. Moreover, the so-called "judicial leniency" argument advanced by the prosecutor in closing arguments during the penalty phase would have been available to

---

offered no explanation whatsoever why the material facts relating to this claim of ineffectiveness of counsel could not have been developed adequately in the coram nobis proceeding. Without a showing of "cause and prejudice" excusing his failure to develop those facts at that time, he is not entitled to an evidentiary hearing in this action.

**26.** In *Footman v. Singletary,* 978 F.2d 1207 (11th Cir.1992), the court of appeals made clear that each separate *factual* allegation of ineffectiveness of counsel must be exhausted in state court. A claim of ineffectiveness not raised in state court is not exhausted for habeas purposes merely because other factually distinct claims of ineffectiveness were raised.

**27.** Even though his coram nobis petition was heard and denied before the effective date of Rule 32's precursor, Rule 20 of the *Alabama Temporary Rules of Criminal Procedure,* both established a grace period of from April 1, 1987, to April 1, 1989, in which collateral attacks upon convictions final before that time could be asserted. Although petitioner filed a Rule 20 petition on November 18, 1988, alleging at least eight errors or omissions by trial counsel, he did not raise any issue regarding counsel allowing the prosecution to refer to his 1975 plea bargain. Thus, petitioner has not presented this particular claim of ineffectiveness in the state courts.

him in any event, even if defense counsel had asked no questions of the witness during the penalty phase. The essence of the closing argument simply was that, because the court had been too lenient with petitioner in 1975, he was later free to rob and murder Thurmon Macon Donahoo. That argument was apparent from the circumstances and was not invited by the narrow questions posed by defense counsel. Counsel's performance was not professionally unreasonable in this regard.

### E. Validity of 1975 Convictions

The fourth specification of attorney error alleged by petitioner asserts that his trial counsel were constitutionally ineffective because they failed to challenge the constitutional validity of the 1975 murder convictions used by the prosecution as one of the aggravating factors making petitioner eligible for the death penalty in this case. The second amended petition for habeas relief alleges at paragraph 52(b) that petitioner's 1975 murder convictions were invalid because (1) the court failed to make an inquiry into petitioner's competency before accepting the guilty plea, (2) the court failed to adequately inform the petitioner of the rights he was waiving, (3) the court did not determine that there was a factual basis for the pleas, and (4) the court did not inform the petitioner of his right to appeal the guilty pleas. The respondents contend that this specification of attorney error is procedurally barred from review because it was not asserted in either petitioner's coram nobis action or his Rule 20 petition.

Far from attempting to refute the assertion of procedural default or to offer a showing of "cause and prejudice" excusing it, petitioner has agreed that this and another claim of ineffectiveness are barred. At page 41 of "Petitioner's Memorandum Of Law In Opposition To Respondents' Motion For Summary Judgment and In Support of Petitioner's Motion For Summary Judgment," petitioner's counsel writes, "Waldrop agrees, however that the ineffectiveness allegations in paragraph 52(b) and 61 are barred and abandons them." Thus, based on the agreement of the petitioner that this particular specification of

ineffectiveness is procedurally barred, it does not justify habeas relief.

### F. Petitioner's Right To Testify

At paragraph 53 of the second amended petition for habeas relief, petitioner asserts that his trial attorneys were constitutionally ineffective because they failed to explain to him his right to testify at the penalty phase and to offer mitigating evidence. Respondents apparently do not assert that this claim is procedurally barred, as it was essentially raised during petitioner's coram nobis action under the general rubric of counsel's failure to adequately investigate and prepare for the sentencing phase of the trial.

The coram nobis court made extensive findings of fact based on the testimony at the coram nobis hearing. That court found that defense counsel had explained to petitioner his right to testify at the penalty phase and the nature of mitigating evidence that could be offered. The coram nobis court made the following findings of fact:

> During Fannin and Pitts [sic] preparation for trial, they attempted to prepare petitioner for what was ahead, including trial procedures and the fact that there would be a sentencing hearing. (*See Tab R–43*, p. 7).

> Additionally, Fannin and Pitts could not put petitioner on the stand because it would have allowed the prosecution to go into the details of petitioner's prior double-murder conviction. They discussed this at length with petitioner and petitioner did not want to testify. Also, Fannin and Pitts had to be concerned that if petitioner testified, he might tell the jury that he preferred death to life without parole. (*See Tab R–43*, p. 9).

These findings of fact are entitled to a presumption of correctness under 28 U.S.C. § 2254(d). On the whole, they are fairly supported by the record of the coram nobis testimony and none of the exceptions specified at § 2254(d) apply. He has proffered no evidence to establish that the findings of fact made by the state coram nobis court are erroneous. *See Sumner v. Mata*, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981). The presumption of correctness ex-

tends to the "basic, primary, or historical facts" found by the state court, but conclusions of law or applications of law to the facts found by the state court are not entitled to a presumption of correctness. *See Glidewell v. Burden,* 822 F.2d 1027 (11th Cir.1987). Once findings of fact are made by the state court consistent with § 2254(d), the burden of proof is on the petitioner to show by convincing evidence that those findings are erroneous. *See Sumner v. Mata, supra.* No such proffer of evidence has been made here.

Based on the findings of fact by the state court, it is apparent that petitioner not only had explained to him his right to testify at the penalty phase of his trial, he and his attorneys decided that he would not testify. Legitimate strategic considerations supported that conclusion, including the fear that, if petitioner testified, the grisly details of his 1975 murder convictions would be developed on cross-examination. Additionally, counsel were afraid that petitioner would simply tell the jury that he wanted the death penalty and not life without parole. In short, petitioner's assertions that his lawyers did not explain to him his right to testify at the penalty phase and that they did not explain to him the concept of mitigation are refuted by the record and testimony at the coram nobis hearing. Consequently, because counsel did explain to petitioner his right to testify and did explain to him the role and purpose of mitigating evidence at the penalty phase, their representation was not ineffective in this regard.

■ The allegations of paragraph 55 through 61[28] of the second amended complaint are all closely related to petitioner's assertion that his defense counsel failed to adequately prepare for the penalty phase and sentencing hearing at trial. Each of these paragraphs allege that defense counsel were constitutionally ineffective because they failed to adequately investigate and prepare to present mitigating evidence during the sentencing phase of petitioner's trial. Specifically, petitioner argues at paragraphs 55

through 57 of the second amended complaint that defense counsel failed to adequately investigate and present mitigating evidence of his violent and abusive childhood and family background. At paragraph 58 and 59, he contends that defense counsel failed to adequately investigate and prepare to present mitigating evidence with respect to his mental instability, and at paragraph 60 he alleges that defense counsel failed to adequately investigate and prepare to present mitigating evidence relating to neurological damage he suffered as a result of a gunshot wound.

It is fair to say that these allegations of ineffectiveness were the primary focus of the petition for writ of error coram nobis and the coram nobis hearing. Extensive testimony was received by the coram nobis court from petitioner's family members, both describing and denying instances of abuse suffered by the petitioner in his formative years. As a result of that testimony, the coram nobis court made lengthy findings of fact set out at Tab R–43. Because those findings of fact are fairly supported by the record of the coram nobis hearing and none of the exceptions identified in § 2254(d) apply, they are entitled to a presumption of correctness to the extent that they set forth basic historic facts. *See Sumner v. Mata, supra.*

Without attempting to recite all of the findings of fact made by the coram nobis court, set out hereinbelow are some of the more pertinent findings relating to the specific assertions of ineffectiveness. In preparation for the trial, defense counsel met with petitioner about twelve times, each meeting lasting about an hour. Petitioner was adamant that he did not want his family involved in the trial, although his common-law wife, Doris Thomas, was used as an alibi witness during the guilt/innocence phase of trial. Although counsel described to the petitioner the trial procedures to expect, including a sentencing hearing, petitioner remained quiet about his background and family history. He never told his attorneys that he suffered

**28.** As previously indicated, petitioner has now expressly abandoned his claim set forth in paragraph 61 of the amended complaint, and, therefore, the court will not consider it to be before the court for decision. *See Petitioner's Memoran-* *dum Of Law In Opposition To Respondents' Motion For Summary Judgment and In Support Of Petitioner's Motion For Summary Judgment, filed December 7, 1990,* at p. 41.

from any physical or sexual abuse as a child or that he suffered from any addiction or substance problems. He did tell them that he had been shot in the head and that he had once shot himself in the stomach. Petitioner objected to his lawyers' contacting his family for investigative purposes, although they did so anyway. Defense counsel interviewed petitioner's mother, one of his sisters, and other members of his family. None of those family members ever disclosed any details about the petitioner's habits or his background. None of them described any abusive or violent childhood or family experiences. Specifically, the trial court found that petitioner had not been sexually abused as a child by either his family, uncle, or half-sister.

The coram nobis court also found that Fannin and Pitts decided not to call family members to testify during the penalty phase of the trial for three reasons. First, the petitioner had made very clear that he did not want to involve his family in the trial. Second, no one in the family had supplied the attorneys with any information that could be useful in support of an argument for mitigation. The Court found:

> At no time did petitioner tell them [defense counsel] about any of the abuse he allegedly suffered. Other family members talked with Fannin and Pitts and they never told them about any abuse petitioner allegedly suffered. Neither petitioner nor any of his family provided Fannin and Pitts with any possible mitigation arising out of any type of abuse, even when mitigation was explained to them.

*See Tab R–43,* p. 15. Lastly, the petitioner clearly informed the attorneys that he did not want to receive a sentence of life without parole but would rather receive the death penalty. (*See R–43,* pp. 8 & 9).

The coram nobis court also made findings of fact with respect to the neurological damage allegedly suffered by the petitioner. The court found that petitioner was shot in the head on November 28, 1981, and, after being initially treated at a hospital in Anniston, was transferred to University Hospital in Birmingham. There, he was treated by Dr. Evan Zeiger a, neurosurgeon, and remained hospitalized only for "a short period of time."

Furthermore, both Dr. Zeiger and Dr. Thomas Boll testified that petitioner had improved to a normal state when he left University Hospital and that he had an excellent prognosis for complete recovery. The treating neurosurgeon, Dr. Zeiger, testified that, in a follow-up examination in February of 1982, he found no evidence that petitioner suffered from any seizure activity, and he expressed the opinion that the injury to the plaintiff's right frontal lobe was located in a "silent portion of the brain" which would not cause so-called "rage attack seizures." A neuropsychologist, Dr. Thomas Boll, who examined and tested the petitioner, offered the opinion that the nature of the injury suffered by the petitioner did not impair his ability to appreciate the criminality of his conduct nor did it cause seizures which contributed in any way to his criminal conduct.

The court found that anecdotal testimony concerning the petitioner's alleged seizures was conflicting and unpersuasive. While family members testified that the petitioner suffered seizure episodes, his common-law wife, Doris Thomas, testified she never witnessed such a seizure, but frequently saw petitioner drunk or hung-over from alcohol and drugs.

The court also made the following finding of fact:

> Fannin testified that he talked with Dr. Zeiger prior to trial and when he learned that Dr. Zeiger's testimony would not excuse petitioner's conduct in any way, he decided not to call Zeiger as a witness. Fannin made a tactical decision not to present evidence of petitioner's head injury.
>
> \* \* \* \* \* \*
>
> Fannin knew of the injury and contacted Zeiger in an attempt to gain some evidence favorable to petitioner's case, but when he realized what Zeiger would testify about he made a tactical decision not to call him as a witness.... Petitioner [sic] or his family's testimony about his head wound would have been overwhelmingly contradicted by Dr. Zeiger's testimony.

*See Tab R–43,* p. 18.

The coram nobis court made further findings with respect to the petitioner's alleged

914

mental instability and the failure of defense counsel to offer evidence of it during the penalty phase of trial. The court found that neither the petitioner nor any member of his family ever conveyed to defense counsel any facts concerning drug abuse or addiction or alcohol use by the petitioner. In fact, the petitioner testified at the coram nobis hearing that his alcohol use was none of his attorneys' business. The court found that, although the petitioner was shot in the stomach with a .22 caliber pistol on August 1, 1981, it was not a suicide attempt. Petitioner's attorneys never witnessed any strange behavior or other evidence indicating that the plaintiff was suffering from a mental disease or defect, and, in fact, petitioner once expressed resentment at the implication that he might have a mental problem.[29]

The coram nobis court included its findings as follows:

> Further, both Fannin and Pitts testified that petitioner told them that he didn't want life without parole, he wanted the electric chair. Petitioner told Fannin and Pitts that he did not want his family involved in the trial. Petitioner never told Fannin and Pitts about his alleged physical and sexual abuse. In fact, by his own testimony, he never told anyone about these incidents until his release from prison when he served time for his prior double-murder. Pitts testified that he was present when petitioner's mother berated him for what he had done, that petitioner had ruined her name and he was going to get what he deserved.

*See Tab R–43,* p. 21.

 In assessing the effectiveness of counsel in relation to the penalty phase in a capital punishment trial, the well-known, two-step *Strickland v. Washington* test still applies. The court must determine whether the decisions made by counsel were professionally unreasonable under all the circumstances and, if so, whether the professionally-unreasonable error or omission resulted in

prejudice to the defense. Where decisions are made for tactical or strategic reasons, strong deference is accorded those decisions. Further, in the particular context of the penalty phase of a capital trial, prejudice focuses on whether "the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Stevens v. Zant,* 968 F.2d 1076 (11th Cir.1992), *cert. denied,* — U.S. ——, 113 S.Ct. 1306, 122 L.Ed.2d 695 (1993) (*quoting Strickland v. Washington,* 466 U.S. 668, 695, 104 S.Ct. 2052, 2069, 80 L.Ed.2d 674, 698 (1984)). An attorney's decisions may be professionally unreasonable if it is outside the wide range of competence expected of attorneys. The court should presume effectiveness, however, and should avoid second-guessing with the benefit of hindsight. *See Strickland v. Washington, supra; Horton v. Zant,* 941 F.2d 1449 (11th Cir.1991); *Elledge v. Dugger,* 823 F.2d 1439 (11th Cir.1987). Even where there has been a showing of a professionally-unreasonable error or decision, it must prejudice the defense before it amounts to ineffectiveness. Prejudice is shown if there is a reasonable probability that the outcome of the proceeding would have been different had the unreasonable error not occurred. That is to say, the error undermines confidence in the outcome of the proceeding. *See Strickland v. Washington, supra.* In the particular context of the sentencing phase of a capital case, the focus is on whether "the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland v. Washington, supra* 466 U.S. at 695, 104 S.Ct. at 2069; *Stevens v. Zant, supra.*

 Although probably a distinction without a difference, petitioner alleges that his attorneys were constitutionally ineffective because they failed to conduct a reasonable investigation to uncover mitigating evidence and because they failed to present mitigating evidence that was available to them. While the failure to present mitigating evidence

---

**29.** The court notes that, before trial, counsel filed a motion on January 18, 1983, moving the court to investigate the petitioner's mental health, suggesting that the "defendant appears insane and in need of psychiatric treatment." After the petitioner was examined by Don Weathington, a coordinator at the Cheaha Mental Center in Talladega, who testified at a hearing, the court denied the motion.

during the penalty phase of a capital trial is not ineffectiveness per se, *see Burger v. Kemp*, 483 U.S. 776, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987); *Stevens v. Zant, supra*, the Eleventh Circuit Court of Appeals has developed a three-step test for assessing the professional reasonableness of an attorney's failure to present mitigating evidence. That analysis has been described as follows:

The steps for proper analysis of an ineffective assistance of counsel claim in a case such as this are well-established. Under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), counsel is deemed to have been ineffective when his acts or omissions were outside the wide range of professionally-competent assistance. An attorney has a duty to conduct a reasonable investigation, including an investigation of the defendant's background, for possible mitigating evidence. *Thompson v. Wainwright*, 787 F.2d 1447, 1451 (11th Cir.1986). *First*, it must be determined whether a *reasonable investigation* would have uncovered such mitigating evidence. If so, then a determination must be made whether the failure to put this evidence before the jury was a *tactical choice* by trial counsel. If so, such a choice must be given a strong presumption of correctness, and the inquiry is generally at an end. *Funchess v. Wainwright*, 772 F.2d 683, 689–90 (11th Cir.1985). If, however, the failure to present mitigating evidence was an oversight, and not a tactical decision, then a *harmlessness review* must be made to determine if there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Thus, it must be determined that defendant suffered *actual prejudice* due to the ineffectiveness of his trial counsel before relief will be granted.

*Middleton v. Dugger*, 849 F.2d 491, 493 (11th Cir.1988); *see also Blanco v. Singletary*, 943 F.2d 1477 (11th Cir.1991). The first step of the analysis is a determination whether there existed, in fact, mitigating evidence that a reasonable investigation would have uncovered. Implicit in this proposition is the assumption that there can be mitigating evidence which a reasonable investigation fails to uncover. The attorney's duty under the Sixth Amendment is to conduct a *reasonable* investigation, not such an exhaustive investigation that all conceivable mitigating evidence is necessarily uncovered. As both the Supreme Court and the Eleventh Circuit have noted, the attorney is not necessarily required to investigate every evidentiary lead; an attorney's decision to limit his or her investigation may be reasonable under the circumstances. *See Strickland v. Washington*, 466 U.S. 668, 691, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674, 695 (1984); *Harris v. Dugger*, 874 F.2d 756 (11th Cir.1989); *Bush v. Singletary*, 988 F.2d 1082 (11th Cir.1993). Thus, the first step of the analysis actually involves two subsidiary questions: Did mitigating evidence, in fact, exist? and, Did trial counsel conduct a *reasonable* investigation to uncover the evidence?

The reasonableness of an investigation also must be assessed in light of all the circumstances. As the Supreme Court has said:

In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all of the circumstances, applying a heavy measure of deference to counsel's judgment.

*Strickland v. Washington*, 466 U.S. 668, 691, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674, 695 (1984). One of the circumstances that bears upon the reasonableness of an investigation is the information supplied by counsel's own client. Just as information supplied by the defendant may point to the need for further investigation, the *lack* of information supplied may also indicate that further investigation would be unnecessary or fruitless. Similarly, a client's demand that counsel undertake or, even, refrain from a particular investigation bears upon the reasonableness of the investigation. *See Mulligan v. Kemp*, 771 F.2d 1436 (11th Cir.1985). A client's failure to disclose information to his attorney, as well as his refusal to assist the attorney, necessarily must be considered in assessing

the reasonableness of the investigation performed by counsel.[30]

The second question presented by the analysis is whether the failure to present existing mitigating evidence was the product of an informed tactical decision or due to oversight. *See Middleton v. Dugger, supra.* While the *reasonableness* of a decision is a question of law for the habeas court, whether a decision constituted a tactical decision is a question of fact to which the presumption of correctness applies. *See Stevens v. Zant, supra; Horton v. Zant,* 941 F.2d 1449 (11th Cir.1991); *Bundy v. Wainwright,* 808 F.2d 1410 (11th Cir.1987).

Finally, if it is determined that counsel failed to present reasonably available mitigating evidence due to error or oversight, and not due to a tactical or strategic decision, ineffectiveness of counsel is established only if the petitioner also shows that the oversight caused actual prejudice. There must be a reasonable probability that the outcome of the sentencing proceeding would have been different if the mitigating evidence had been presented. Stated another way, there must be a reasonable probability that the sentencer, if presented with the mitigating evidence, would have determined that the balance of aggravating and mitigating circumstances leaned against imposition of the death penalty. *See Stevens v. Zant, supra.*

The court concludes that the investigation undertaken by defense counsel to identify potential mitigating evidence was not professionally unreasonable. While the investigation was far from the most thorough, defense counsel made reasonable efforts to identify those factors in the petitioner's history, background, and present circumstances that could be offered to the jury in mitigation of the death sentence. Even though they interviewed the petitioner for a total of approximately 12 to 15 hours and interviewed petitioner's mother and sister, no one ever disclosed to counsel any instances of violent, physical, or sexual abuse or neglect suffered by the petitioner during his formative years.

Although it is true that defense counsel knew that petitioner came from a large, poor family and, arguably, could have sought out each sibling and relative to interview, the lack of information supplied to them by petitioner himself and by petitioner's mother and sister plainly indicated to them the fruitlessness of such a pursuit. It was not unreasonable for counsel to conclude, in the face of the lack of information supplied to them to that point, that there was little reason to continue seeking out other relatives to probe the petitioner's background. As the Supreme Court has said:

> [S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgment. The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information ... and when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.

*Strickland v. Washington,* 466 U.S. 668, 691, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674, 695–96 (1984).

The fact that petitioner and his family were not forthcoming with information concerning his background is confirmed not only

---

**30.** Counsel must not merely surrender to the "defeatism" of his client, however. Counsel must undertake enough of an investigation to be able to reasonably advise his client about the advantages and disadvantages of further investigation. *See Blanco v. Singletary,* 943 F.2d 1477 (11th Cir.1991).

by the testimony of defense counsel, but also by the presentence report prepared for use by the sentencing court. In that report, the investigating probation officer wrote the following about the petitioner's family history:

Billy Wayne Waldrop was born 2–6–52 in Calhoun County, Alabama, is a product of a broken home in which there were apparently a number of father figures. However, until age 13 his natural father was in the home and since that time primarily his father image has been step-father Douglas Norman. There are no known instances of severe or traumatic events during adolescence which would have interfered with normal personality development and the home appears to have been economically within the low income level. Based on Waldrop's subsequent behavior, however, whether his personality development up to this point has been normal is very much open to question.

*See Trial Record, Volume I*, p. 67. Obviously, the extensive physical and sexual abuse described in the coram nobis testimony was not made known to the investigating probation officer at the time he prepared his presentence report following the penalty phase of trial but before the sentencing hearing in March of 1983. Just as counsel was not aware of those aspects of his youth, so the probation officer was unaware. This appears to confirm the testimony by defense counsel that neither petitioner nor his family made that information available to them.

Further evidence of the reticence of the petitioner and his family arises in connection with petitioner's alleged alcohol and drug abuse. At the coram nobis hearing, in fact, petitioner testified that he did not believe that his drug and alcohol use was any of his lawyers' business. At page 156 of the coram nobis testimony, the petitioner himself testified as follows:

Q. Now, I want to take you to the time when you were—well, let me ask you this. Did you ever discuss any of these things, such as your childhood, your suicide attempts, being shot in the head, medication, any of those type things with your lawyers?

A. Referring to Hank Fannin and R.D. Pitts?

Q. Yes.

A. No, I haven't.

Q. Why didn't you tell them about that?

A. Well, I really didn't think it would be important. Besides the fact, to sit up here, you know, and tell you that your dad was a homosexual and your uncle was a homosexual and your sister was a child molester. That's something I held within me for years, that I kept to myself. I didn't feel, or even know that it could be used.

*See Coram Nobis Hearing Transcript, Volume II*, p. 156. Later, on cross-examination, he once again testified:

Q. You never told Mr. Fannin and Mr. Pitts you drank, did you?

A. Mr. Fannin knew I drank.

Q. You never told him that you drank from the time you got up in the morning until you went to bed at night or passed out?

A. I don't think he ever asked me.

Q. But you never told him that. You never told him that you had a drinking problem, did you?

A. I didn't feel it was any of his business.

Q. You testified on direct examination you use drugs. A variety of drugs. That you were addicted to cocaine and several other things.

A. Yes.

Q. You never told Mr. Fannin or Mr. Pitts that you used drugs or that you were addicted to any drugs, did you?

A. Mr. Fannin knew I was using drugs.

Q. Did you tell him you were using drugs?

A. Yeah, he knew that . .

Q. All these things we have talked about, the abuse, the sexual abuse, the physical abuse, you never told Mr. Fannin and Mr. Pitts any of these things that you allege in this petition should have been brought out at the trial as mitigation, did you?

A. No, I didn't.

*See Coram Nobis Hearing Transcript, Volume II,* p. 195–196.

Finally, the evidence and findings of fact made by the trial court also established that a reasonable investigation was undertaken with respect to the neurological damage petitioner allegedly suffered due to the gunshot wound to his head. Defense counsel contacted the neurosurgeon who had treated petitioner at the University of Alabama Birmingham Hospital, who told counsel that petitioner had recovered well from the injury. He further explained that the gunshot wound was to a "silent" portion of the brain which would not trigger rage, seizures, or other conduct relating to petitioner's criminality. In short, the neurosurgeon explained to defense counsel that the gunshot wound could not be offered as an excuse for petitioner's murderous behavior. In light of that information, defense counsel's decision to pretermit further investigation in this area was professionally reasonable because it appeared to be fruitless if not harmful to the petitioner.

 Similarly, the decisions made by counsel not to present the testimony of the petitioner, his mother, and Dr. Zeiger for purposes of mitigation during the penalty phase of the trial were reasonable and did not amount to ineffectiveness. The petitioner already had told his attorneys that he did not want to be sentenced to life without parole but wished to receive the death penalty. Given that posture by the petitioner, counsel's decision not to put him on the witness stand was professionally reasonable because they could not run the risk that the petitioner would tell the jury that he wanted the death penalty rather than a life sentence. Likewise, they could not offer the testimony of the petitioner's mother because, at that time, she was openly hostile to petitioner. During the guilt phase of the trial, petitioner, his attorneys, and his mother all met in a small witness room. There, petitioner's mother berated him, saying that he had brought disgrace upon her name and that he deserved to receive whatever he got. Mr. Pitts testified as follows:

Q. During the course of the trial, did you have an occasion to witness a discussion between, or overhear a discussion between Billy Wayne Waldrop and his mother?

A. Yes, sir, I did. I remember quite vividly, it was here in the room off to the left. The door shut and it was in privacy, he wanted to see his mother. He asked if he could see her. We approached the deputies and asked if she could be brought back. She was brought back and both Mr. Fannin and I were present, along with Mr. Waldrop and his mother.

Q. Excuse me. About when was this?

A. I think it was maybe two days into the trial, as I recall.

Q. Excuse me for interrupting, go ahead.

A. Now, I didn't take any notes on this. I don't always take notes on everything that happens. But I remember this quite vividly. And she was extremely irate. She was angry with him because she said that he had dragged her name down. That he had disgraced her. She said that he had always been a disgrace and went into a tirade about his supposed meanness and this sort of thing, and had no sympathy with him whatsoever.

Q. Did this influence your decision or influence you in any way in deciding whether or not to call his mother as a witness during the trial?

A. Yes, it did. We didn't think that she would be a good witness at all, due to her emotional state, and due to be feelings that she had expressed toward her son.

*See Coram Nobis Hearing Transcript, Volume III,* pp. 343–344.

Plainly, counsel's decision not to rely upon petitioner's mother to offer evidence in mitigation of punishment was not unreasonable. Given her open hostility to Waldrop, counsel reasonably concluded that it was too risky to call her as a witness in mitigation. Her behavior and lack of sympathy toward the petitioner made her testimony unpredictable. *Compare Bush v. Singletary, supra.*

The decision not to offer the testimony of Dr. Zeiger also was not unreasonable. As

already mentioned above, Dr. Zeiger's description of petitioner's head wound undercut any argument that amounted to mitigation. As he later testified by deposition, the petitioner was shot in the right frontal lobe of the brain. Damage to it and removal of portions of it due to the gunshot would have no effect, no neurological deficit in either the petitioner's mental or physical functioning. He further testified that the brain injury healed well and that in February of 1982, an electroencephalogram was normal and showed no evidence of any seizure activity as a result of the wound. Further, Dr. Zeiger discounted any relationship between the head wound and any "rage attack seizures." He testified that, to his knowledge, no such seizures exist and, if ever they did, they would have started with the temporal lobe and not the frontal lobe. (*See Deposition of H. Evan Zeiger*).

At the very least, the information supplied to defense counsel by Dr. Zeiger was not helpful and, arguably, was harmful. By discounting any connection between the petitioner's gunshot wound to the head and violent criminal conduct, Dr. Zeiger would have bolstered the prosecution's argument that petitioner was simply a vile and violent sociopath and well-deserving of the death penalty. Counsel's decision to avoid that prospect was professionally reasonable. The Sixth Amendment "does not compel an attorney to urge an argument which he reasonably finds to be futile, let alone one he fines to be false." *Bush v. Singletary,* 988 F.2d 1082, 1092–1093 (11th Cir.1993).

 Finally, turning to the third step in the *Middleton* analysis, the court finds that, even if counsel's decisions not to further investigate and present this mitigating evidence were professionally unreasonable, there is no reasonable probability that the outcome of the sentencing procedure would have been different had the errors not occurred. First, it simply cannot be argued

that evidence establishing that the petitioner had a long-standing history of excessive alcohol and multiple drug usage could constitute evidence in mitigation of the death penalty. Indeed, that information was brought to the sentencing *judge's* attention in the presentence report, yet it did not change the outcome of the sentencing judge's decision to impose the death penalty.[31] It is hard for the court to seriously consider petitioner's argument that, if his attorneys had presented evidence to the jury during the sentencing phase to show that petitioner routinely drank until he passed out and used all manner of illicit drugs, the jury would have concluded that he should not receive the death penalty. Because ultimately the evidence of the petitioner's alcohol and drug abuse was not mitigating in nature, the failure to offer it does not undermine confidence in the outcome of the sentencing decision.

Similarly, for the reasons already discussed at length, there is no reasonable probability that the outcome of the sentencing hearing would have been different if counsel had offered the testimony of petitioner, his mother, and Dr. Zeiger. It is possible, if not likely, that petitioner would have informed the jury that he wanted the death penalty and did not want a sentence of life without parole. Likewise, the petitioner's mother was openly hostile to him at that time and there is no reason to believe that her testimony would have been sympathetic in nature. Finally, Dr. Zeiger's testimony simply does not establish any basis for excusing the petitioner's conduct based on his head wound. The absence of the testimony of these three persons does not undermine confidence in the outcome of the sentencing procedure.

## G. Presentence Report

 The next allegation of ineffectiveness of counsel[32] asserts that defense counsel

---

**31.** *See* footnote 41, *infra.*

**32.** The court omits a discussion of the allegation of ineffectiveness asserting that defense counsel failed to adequately investigate and present mitigating evidence relating to a polygraph examination taken by the petitioner. Petitioner has now conceded that this particular claim for habeas

relief is barred by the doctrine of procedural default, and he has abandoned it. *See Petitioner's Memorandum Of Law In Opposition To the Motion For Summary Judgment,* filed December 7, 1990, p. 41 ("Waldrop agrees, however, that the ineffectiveness allegations in paragraphs 52(b) and 61 are barred and abandons them.").

failed to request a hearing on the accuracy of certain information contained in the presentence report reviewed by the sentencing judge at the time he imposed the death penalty on March 22, 1983. As specifically alleged at paragraph 62 of the Second Amended Petition For Habeas Corpus Relief, he argues:

> The presentence report contained extremely prejudicial allegations, apparently based on interviews of other inmates in the county and city jails where petitioner awaited trial. [Citation omitted]. At sentencing before the court on March 22, 1983, counsel asked the court not to consider the allegations in the report. However, trial counsel did not request a hearing on the accuracy of the report, or an opportunity to cross-examine the sources of its assertions or to offer evidence to rebut those assertions.

In their answer to the amended petition, the respondents denied pertinent portions of the allegation but did not assert that the claim was procedurally barred.

At the outset, there does seem to be an issue concerning the procedural default of this claim. An examination of the petitioner's 1985 coram nobis petition and his 1988 Rule 20 petition indicates that this particular claim of ineffectiveness of counsel was not asserted and, it appears, has never been presented to any state court. Because he may not now return to state court to file a Rule 32 action to raise this challenge, *see* *A.R.Crim.P. 32.2(b)*,[33] it is procedurally barred from consideration. *See Collier v. Jones*, 910 F.2d 770 (11th Cir.1990). Because the respondents have not asserted procedural default as a defense, however, it is debateable whether the court may dispose of the claim on that basis. Furthermore, because the claim is so patently meritless, the court will pretermit discussion of procedural default because, even if it did exist, it is obvious petitioner would not be able to estab-

lish the prejudice prong of the cause-and-prejudice test to overcome it.

■ The petitioner's challenge to counsel's conduct is *not* that he failed to object or otherwise challenge prejudicial hearsay information contained in the presentence report. Plainly, that cannot be petitioner's claim because the record is clear that counsel *did* object and attempt to persuade the court to disregard those portions of the presentence report. Petitioner's contention is that counsel failed to ask for a hearing, the purported purpose of which would be either to clarify those portions of the presentence report or to cross-examine the sources of the information contained in the report. Nothing has been presented by the petitioner, however, to establish that any of the information conveyed by the report is false and, consequently, he has not shown that counsel's failure to request a hearing resulted in actual prejudice.

It must be remembered that the claim of ineffective assistance of counsel requires the conjunctive proof of an unprofessional error and that the error resulted in actual prejudice to the defense. Prejudice in this particular instance means that there is a reasonable probability that the trial judge would not have imposed the death penalty had counsel requested a hearing with respect to the presentence report. This court concludes, however, that there is no reasonable probability that the outcome of the sentencing hearing would have been different. There is no evidence to prove that counsel could have successfully rebutted or attacked the credibility of any of the matters set forth in the presentence report even if he had requested a hearing. Further, if a hearing had been held, the court is persuaded that the trial judge would have reached the same conclusion in any event. Although the trial judge indicated in his findings that he studied the presentence report, none of his *specific* findings relating to aggravating and mit-

---

**33.** Rule 32.2(b) of the *Alabama Rules of Criminal Procedure* provides:

> The court shall not grant relief on a second or successive petition on the same or similar grounds on behalf of the same petitioner. A second or successive petition on different grounds shall be denied unless petitioner

shows both that good cause exists why the new ground or grounds were not known or could not have been ascertained through reasonable diligence when the first petition was heard, and that the failure to entertain the petition will result in a miscarriage of justice.

igating circumstances indicate that he relied upon any of the allegedly prejudicial hearsay statements in the presentence report. In short, there simply is no basis for concluding that there is a reasonable probability that counsel's failure to request a hearing with respect to the presentence report caused the sentence of death to be imposed rather than a sentence of life without parole. Petitioner is not entitled to relief on this ground.

## H. Appeal

 Petitioner's final specification of ineffectiveness of counsel relates to his direct appeal from conviction. In particular, he contends that his attorneys were constitutionally ineffective because (1) the initial brief failed to cite any case authority; (2) they failed to argue as an issue the trial court's failure to appoint a defense psychiatrist; and (3) they failed to argue as an issue the trial court's allegedly erroneous consideration of prejudicial hearsay in the presentence report. The court concludes that none of these allegations merit relief.

 As is true with respect to the ineffectiveness of trial counsel, to establish a claim against appellate counsel, it is necessary to show that appellate counsel's representation fell below an objective standard of reasonableness for attorneys and that specific errors resulted in actual prejudice to the defense. *See Williams v. Weldon*, 826 F.2d 1018 (11th Cir.1987), *cert. denied*, 485 U.S. 964, 108 S.Ct. 1231, 99 L.Ed.2d 431 (1988). To the extent that petitioner asserts that his attorney was ineffective for failing to raise and assert certain appellate issues, the test is whether those issues not raised "contain sufficient merit that appellate counsel can be faulted for not having raised them." *Williams v. Weldon, supra (quoting Funchess v. Wainwright*, 772 F.2d 683, 695 (11th Cir.1985), *cert. denied*, 475 U.S. 1031, 106 S.Ct. 1242, 89 L.Ed.2d 349 (1986)).

Petitioner's first argument asserts that his appellate counsel was ineffective because his initial brief failed to cite any case authority. Petitioner points out that the entire initial brief on direct appeal consists of eleven pages, including the certificate of service page, only about five pages of which consti-

tute legal argument. Although Attorney Fannin testified at the coram nobis hearing that he had intended to file a no-merit brief, the brief does in fact raise three substantive issues on appeal, including whether the trial erred by not granting the defendant's motion for mental examination, whether the trial court erred by not granting the defendant's motion for change of venue, and whether the trial court erred by allowing the defendant's confession into evidence. It is true that no cases were cited with respect to any of these arguments, and, in fact, on page 1 of the brief appears the following:

> Counsel for defendant respectfully states to this court that no cases have been found as precedent for their argument in this appeal. It is felt that the argument presented herein is one of first impression and of great significance where the sentence of death is imposed.

*See Tab R–29.*

Later, at the request of the Alabama Court of Criminal Appeals, petitioner's counsel filed another brief. Not only did that brief expand upon the confession issue argued in the initial brief, but it added an additional argument concerning allegedly prejudicial remarks made by the prosecutor during closing arguments. Contained in the brief was a "Memorandum Of Authority" which cited in summary form several cases involving the adequacy of *Miranda* warnings and prejudice flowing from undue pretrial publicity. (*See Tab R–30.*).

While the court agrees that the briefs filed for the defendant by Hank Fannin and R.D. Pitts fall far short of being models of advocacy for death-penalty defendants, the court cannot say that their representation of the petitioner on direct appeal was so inadequate that it fell below the objective standard of competence expected of attorneys. Far from thorough and plainly-lacking in any serious effort, the briefs nevertheless raise substantive issues for consideration by the appellate court. The briefs effectively put before the court challenges to the admission of the confession, the trial court's refusal to change venue, the trial court's refusal to commit the defendant for mental examination, and the

unfairness of arguments made by the prosecutor. That none of these proved persuasive on appeal does not mean that the briefs fell below an objective standard of competence. The mere fact that the initial brief failed to cite any case authority, even if one expands that issue to attack generally the quality of the briefs themselves, cannot be said to make the briefs so deficient and so inadequate that appellate counsel failed to meet the broad scope of competence expected of defense counsel.

Petitioner also claims that his attorney was constitutionally ineffective on appeal because he failed to raise and argue two specific issues: whether the trial court erred by failing to appoint a defense psychiatrist and whether the trial court erred by considering hearsay in the presentence report. Specifically, petitioner alleged at paragraph 63 of the Second Amendment Petition the following:

> On appeal, Mr. Fannin failed to raise many of the issues raised herein, including the failure of the trial court to appoint a defense psychiatrist and the trial court's erroneous consideration of hearsay in the presentence report.

To the extent that the petition does not identify issues that could have been raised and argued on appeal, it fails to establish a basis for habeas relief. The court cannot speculate about the effectiveness of counsel on appeal except in the context of specifically-identified issues that could have been argued but were not. Consequently, the only two claims petitioner identifies as having been omitted from the appeal are the trial court's failure to appoint a defense psychiatrist and the trial court's consideration of

hearsay in the presentence report. The court is in a position to consider only whether the omission of these claims on appeal constituted ineffectiveness.

It should be noted that defense counsel did argue on direct appeal that the trial court committed reversible error "in not honoring defendant's motion for commitment to a mental institution for examination." The issue before the habeas court, therefore, is not whether appellate counsel was constitutionally ineffective because he failed to raise an appellate issue regarding the defendant's competence to stand trial. Rather, it asserts that appellate counsel was ineffective because he failed to argue a claim under *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). Although far from clear, the reference to a "defense psychiatrist" only can be understood as asserting that counsel was ineffective because he did not raise on appeal the issue whether the trial judge should have appointed a psychiatrist to assist with the defense.

The short answer to the argument is that *Ake* was decided in 1985, long after the briefs on direct appeal had been written and filed.[34] The Eleventh Circuit has already held that the decision in *Ake* was a change in the law not foreseeable by reasonable attorneys before its announcement and, therefore, an attorney's failure to anticipate its holding cannot be said to be ineffectiveness. *See Thompson v. Wainwright*, 787 F.2d 1447, 1459, n. 8 (11th Cir.1986); *see also Clisby v. Jones*, 960 F.2d 925, 928–29, n. 6 (11th Cir. 1992).[35] At the time petitioner's attorneys were drafting and filing his briefs on direct appeal, *Ake* had not been announced. Because attorneys cannot be faulted for failing to foresee the future development of consti-

---

**34.** The briefs were initially filed with the Alabama Court of Criminal Appeals in the fall of 1983. That court issued its opinion in *Waldrop v. State*, 459 So.2d 953 (Ala.Crim.App.1983), on November 29, 1983, and denied re-hearing on January 10, 1984. An automatic appeal to the Alabama Supreme Court was decided on September 28, 1984. *See Ex parte Waldrop*, 459 So.2d 959 (Ala.1984). That court denied re-hearing on November 9, 1984. A petition for certiorari to the United States Supreme Court was then filed and ultimately denied on April 15, 1985. *See Waldrop v. Alabama*, 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1985).

**35.** In *Burger v. Zant*, 984 F.2d 1129 (11th Cir. 1993), the court of appeals held that a habeas petitioner's assertion of an *Ake* claim in a 1989 petition was an abuse of the writ after it was not raised in his 1980 petition. Implicit in that holding is the proposition that *Ake* was not so novel that it could not have been anticipated when petitioner filed his 1980 petition. How this can be squared with *Thompson* and *Clisby* is unclear.

tutional law, their failure to argue on appeal that the trial court erred by failing to appoint a "defense psychiatrist" was not constitutionally ineffective. *See Thompson v. Wainwright, supra.*

Likewise, counsel's failure to raise an appellate issue concerning the inclusion of hearsay in the presentence report does not amount to ineffectiveness of counsel under the Sixth Amendment. There simply is no basis for concluding that this issue was of such substantial merit that counsel can be faulted for failing to assert it on appeal. The court notes that Alabama law applies a harmless error analysis to capital-sentencing cases, *see Whisenhant v. State,* 482 So.2d 1241 (Ala.1983), which would have eviscerated much of the merit that might have existed in this argument. For the reasons already discussed above, the trial court found that there was clear and convincing evidence supporting at least two aggravating circumstances and that there was no mitigating evidence. Given that finding by the trial court, there is no reasonable probability that the inclusion of hearsay in the presentence report had any significant impact on the trial judge's decision to impose the death penalty, nor is there a reasonable probability that the appeal of this issue would have been successful. Counsel's failure to raise this argument on appeal, preferring instead to focus upon four other issues raised and argued, cannot be said to be a professionally-unreasonable error.

In short, petitioner has not shown that the services of his attorneys on direct appeal fell below an objective standard of competence expected of attorneys. While the briefs they filed can be fairly described as scant and half-hearted, they did raise and prosecute four separate claims for appellate review which were reasonably related to the facts and law applicable to the case. Giving due deference to the decisions made by counsel without the distorting effects of hindsight, their representation of the petitioner on direct appeal was not professionally incompetent. He is not entitled to relief on this ground.

## V. Psychiatric–Assistance Claim

At paragraphs 64 through 68 of the petition for writ of habeas corpus as amended, petitioner asserts that his Sixth, Eighth, and Fourteenth Amendment rights were violated because the trial court failed "to appoint a defense psychiatrist to explore the issues of petitioner's sanity and to assist in the development of mitigating evidence...." Paragraph 64 specifically cites the Supreme Court's decision in *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). The respondents have answered that this claim was procedurally defaulted because it was not raised either at trial or on direct appeal from conviction.

Following petitioner's indictment in December of 1982, his attorneys filed a motion on January 18, 1983, raising questions about the petitioner's sanity. (*See Tab R–1* ). The motion alleged that petitioner "appears insane and in need of psychiatric treatment," and that he "has suffered mental illnesses in the past." The motion also asserted that the petitioner could not afford to pay for a psychiatric examination or otherwise seek medical or psychiatric help himself, and it prayed for the following relief:

> [T]he petitioner respectfully prays this honorable court will institute a careful investigation, call a responsible psychiatrist or other credible witnesses and if deemed necessary, call a jury, and if satisfactorily proven that the defendant is insane, or appears to be insane, an order will be issued by this honorable court ordering his custody and removal to the Alabama state mental hospital where he shall remain until restored to his right mind.

A hearing was held on February 7, 1983, at which two witnesses testified. Don Weathington testified that he was the coordinator of the Cheaha Mental Health Center in Talladega and that he had interviewed the petitioner for an hour and fifteen minutes at the request of the prosecution. He concluded that the petitioner was not suffering from any mental disease or defect. The petitioner's cell-mate, Marshall Ray Nelson, testified about his experiences sharing a cell with petitioner for three weeks. He indicated that the petitioner frequently spoke of death

and, on one occasion, had suggested that the two stab each other in the stomach with knives. (*See Tab R–5* ).

Following the conclusion of the hearing, the trial court entered an order denying the motion. That order, in its entirety, reads as follows:

> This cause coming on for hearing this date, upon petition of the defendant for a mental examination, and the court having duly considered the testimony presented at the hearing, and having considered the actions and demeanor of the defendant at that hearing, finds as follows:
>
>> That there was no legal nor competent evidence presented to satisfactorily prove that the defendant is insane at this time nor was insane at the time of the commission of the alleged offense and no evidence presented that would justify an order for the defendant's confinement and examination in a mental hospital.
>>
>> That the defendant has sufficient present ability to consult with his attorney with a reasonable degree of rational understanding, and that the defendant has a rational, as well as a factual understanding, of the proceedings against him and that the petition for mental examination should be denied and overruled. It is, therefore, ORDERED, ADJUDGED AND DECREED that the defendant's petition for a mental examination be, and the same is, hereby DENIED and OVERRULED.

*See Tab R–2.* On direct appeal from conviction, the Alabama Court of Criminal Appeals treated this issue as one bearing upon competence to stand trial. Referring to the testimony of the cellmate, that court wrote, "Although Nelson's testimony indicates that

Waldrop's behavior was odd or deviant, it in no way indicates that he was mentally incompetent to stand trial." *Waldrop v. State,* 459 So.2d 953, 955 (Ala.Crim.App.1983). On certiorari, the Alabama Supreme Court did not discuss the issue further but stated simply that it affirmed the decision of the Court of Criminal Appeals. *See Ex Parte Waldrop,* 459 So.2d 959 (Ala.1984).

The respondents assert that the *Ake* claim now presented in this federal habeas action is procedurally barred because it was not raised either at trial or on direct appeal. *Ake* was announced by the Supreme Court on February 26, 1985, approximately six weeks before the petition for writ of certiorari then pending in the United States Supreme Court was denied on April 15, 1985. Plainly, petitioner's trial and appeals in state court occurred before the announcement of the *Ake* decision, although his conviction was not yet final because a petition for writ of certiorari was then pending in the United States Supreme Court. The holding in *Ake* may have constituted a new rule of law not reasonably foreseeable before it was announced.[36] If it was not reasonably foreseeable during his trial and state appeals, petitioner is able to show cause for his failure to raise the *Ake* claim at trial and on direct appeal. *See Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977); *but see Burger v. Zant,* 984 F.2d 1129 (11th Cir.1993) (*Ake* claim should have been raised in a *1980* habeas petition, and failure to do so was abuse of the writ when raised in 1989 petition). In short, the first real opportunity for petitioner to assert the *Ake* claim occurred when he filed his petition for writ of error coram nobis in the Circuit Court of Talladega County on June 4, 1985.

---

**36.** Although not discussed explicitly, footnote 6 in the Eleventh Circuit's *en banc* decision in *Clisby v. Jones,* 960 F.2d 925 (11th Cir.1992), suggests that the *Ake* rule constitutes a new rule of law for purposes of the retroactivity test established in *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). The *en banc* court specifically declined to address the retroactivity question, although it seems to assume that the *Teague* rule would apply to preclude application of *Ake* to Clisby's case because Clisby's petition for writ of certiorari on direct appeal was

denied one day *before* the opinion was announced in *Ake.* The implicit assumption is that *Ake* announced a new rule of law not dictated or mandated by previous precedent. *See also Burger v. Zant,* 984 F.2d 1129 (11th Cir.1993) (declining to decide whether *Ake* is a new rule under *Teague* ). Moreover, in *Thompson v. Wainwright,* 787 F.2d 1447 (11th Cir.1986), the Eleventh Circuit held that *Ake* was not reasonably foreseeable so that an attorney's failure to assert an *Ake* claim before 1985 was not ineffectiveness of counsel. *See id.* at n. 8.

■ When petitioner filed his petition for writ of error coram nobis in the Circuit Court of Talladega County, he did not include a claim under *Ake v. Oklahoma, supra.* Although the petition was filed on June 4, 1985, more than three months after the *Ake* decision was announced, it does not include a claim that petitioner's right to due process was violated by the trial court's failure to appoint a psychiatric expert to assist the defense. Indeed, the closest the petition came to alleging such a claim was the assertion that trial counsel was constitutionally ineffective because they failed to seek independent psychiatric assistance from the court. At paragraphs 19 through 23 of the petition for writ of error coram nobis, the petitioner alleged that his examination by Don Weathington was inadequate and that "Counsel did not move the court for funds for an independent expert to conduct an investigation of psychological mitigating factors and to assist counsel in his presentation of these factors to the jury." (*See Error Coram Nobis Petition,* p. 9 para. 22). An allegation of ineffective assistance based on an alleged constitutional violation, however, is different from asserting the constitutional violation itself.[37] Consequently, the claim merely that counsel was constitutionally ineffective for failing to seek funds for an independent psychological expert does not raise the *Ake* claim that petitioner's right to due process of law was violated because the trial court failed to supply the defense with an independent psychological expert.

■ Even if the court were to conclude that asserting a claim of ineffective assistance of counsel based upon an *Ake* violation is the same as raising the *Ake* claim itself, it is clear that petitioner did not argue that aspect of his ineffective assistance of counsel claim on appeal from denial of error coram nobis relief. Neither petitioner's briefs on appeal nor the opinion of the Alabama Court of Criminal Appeals refer to a claim of ineffectiveness due to counsel's failure to seek an independent psychiatric expert. Thus, to the extent the *Ake* claim was asserted as a subpart of a claim of ineffectiveness in the original petition for writ of error coram nobis, it was abandoned on appeal from denial of coram nobis relief and, therefore, remains unexhausted and procedurally defaulted. *See Collier v. Jones,* 910 F.2d 770 (11th Cir.1990).

■ The same thing happened when petitioner's first Rule 20 petition was filed in the Circuit Court of Talladega County on November 18, 1988. In that petition, a different set of attorneys again asserted that trial counsel had been constitutionally ineffective because they failed to move the court for an independent psychological or psychiatric "examination" of petitioner. Again, pled in the context of ineffective assistance of counsel, this does not assert a claim for relief based upon a violation of *Ake v. Oklahoma.* A claim that counsel is constitutionally ineffective because he fails to seek an independent psychiatric expert is not the same as asserting a claim for relief based on the trial court's refusal to appoint an independent psychiatric expert. Thus, the Rule 20 petition did not raise an *Ake* claim.

■ In sum, the *Ake* claim petitioner now seeks to present in this habeas action has never been presented to any state court. The procedural default lies not in petitioner's failure to present this claim at trial and on direct appeal, at a time before *Ake* was announced; rather, the procedural default arises from the petitioner's failure to present the *Ake* claim in an appropriate collateral proceeding within the two-year period of limitation provided by Rule 32.2(c) of the *Alabama Rules of Criminal Procedure.*[38] Under the provisions of that rule, petitioner had

**37.** In *Atkins v. Singletary,* 965 F.2d 952 (11th Cir.1992), the Court of Appeals made clear that a claim of ineffective assistance of counsel alleging an unprofessional error arising from a constitutional violation is not the same as alleging a claim based upon that constitutional violation. In *Atkins,* the court drew a distinction between a claim asserting a violation of *Miranda* and a claim that appellate counsel was constitutionally ineffective for failing to raise the *Miranda* claim on direct appeal. *See Atkins v. Singletary,* 965 F.2d 952, 961 (11th Cir.1992).

**38.** Rule 32.2 formerly was codified as Rule 20.2 of the *Alabama (Temporary) Rules of Criminal Procedure.* The substantive provision of the rule, however, has been the same since April of 1987 when it was first promulgated.

until April of 1989 to present all claims challenging the constitutional validity of his conviction and death sentence. Consequently, he is now barred from attempting to present the *Ake* claim in a new Rule 32 petition, and that bar is an independent and adequate state basis for precluding this court from addressing the merits. *See Whiddon v. Dugger*, 894 F.2d 1266 (11th Cir.1990). Further, petitioner has not shown cause-and-prejudice excusing the failure to present the claim within the two-year limitation period. While several attorneys have asserted claims of ineffectiveness of counsel based on trial counsel's failure to seek an independent psychiatric expert, none has pled that the denial of a psychiatric expert violated the petitioner's due process rights under the Fourteenth Amendment. There has been no showing of any objective impediment to the petitioner's efforts to assert the claim such that there would be cause excusing the failure to present it. *See Murray v. Carrier*, 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). Absent a showing of cause and prejudice, the procedural default precludes this court from addressing the merits of the *Ake* claim. *See Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

 Even if the court were to consider petitioner's *Ake* claim on the merits, it would not warrant habeas relief. In *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), the Supreme Court held that the due process claim of the Fourteenth Amendment required that the "state, at a minimum, assure the [indigent] defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in the evaluation, preparation, and presentation of the defense" whenever he "demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial." *Ake v. Oklahoma*, 470 U.S. 68, 83, 105 S.Ct. 1087, 1096, 84 L.Ed.2d 53 (1985); *see also Clisby v. Jones*, 960 F.2d 925 (11th Cir.1992). The Eleventh Circuit has

held that *Ake* claims are to undergo a two-step analysis which requires first an examination of the information before the trial court when it denied the appointment of an independent psychiatric expert and, second, whether that information would have led the trial court to believe the defendant would probably not receive a fair trial. In particular, there must be a sufficient showing to the trial judge that the petitioner's sanity at the time of the offense would be a "significant factor" at trial. *See Cowley v. Stricklin*, 929 F.2d 640 (11th Cir.1991).

At the time the trial court ostensibly denied the appointment of an independent psychiatric expert, the only information before it indicated that petitioner had no mental diseases or handicaps. Indeed, a trained psychiatric counselor testified that he could find no mental diseases or defects in the petitioner after interviewing him for an hour and fifteen minutes. Although petitioner's cellmate was offered to establish that petitioner suffered headaches, sleeplessness on occasion, and violent mood swings, there was no showing that petitioner was delusional or psychotic. There was no information before the court to suggest that the petitioner had a viable insanity defense.[39] Thus, the information known to the trial judge at the time of trial did not demonstrate that the petitioner's sanity would be a "significant factor" in his defense or sentencing. The failure of the trial judge, therefore, to provide the petitioner with an independent psychiatric expert did not deprive him of a fair trial, and he, thus, is not entitled to habeas corpus relief on this claim.

## VI. Improper Prosecutorial Arguments

At paragraphs 69 through 73 of the second amended petition for writ of habeas corpus, petitioner identifies several remarks made by the prosecutor during both the guilt and sentencing phases of his trial, which he contends were improper and deprived him of a fundamentally fair trial. While the petition-

---

**39.** Indeed, even after the extensive coram nobis and collateral proceedings litigated by the petitioner, there still is *no* evidence to suggest that he ever had a viable insanity defense. There is no evidence before this court even today that petitioner ever suffered from any mental disease or

defect that would rise to the level of a colorable insanity defense. The deposition testimony of Dr. Norman Poythress, a psychological expert retained by the petitioner, found only that petitioner suffered from depression.

er has grouped these arguments in terms of subject-matter, regardless of whether the arguments occurred in the guilt phase or in the penalty phase, it is more appropriate to separate those arguments occurring in the different phases of the trial. At paragraph 73 of the amended petition, petitioner challenges a comment made during the guilt phase of the trial, but asserts that it was emphasized and exacerbated by the court's jury instruction during the sentencing phase. In essence, petitioner contends that the argument violated *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), by misleading the jury about the importance of its role in the decision. This claim will be discussed separately below.

## A. Guilt Phase Arguments

At paragraph 70 of the second amended petition, petitioner identifies three comments made by the prosecutor during closing arguments in the guilt phase of his trial, which he contends were improper because they exhorted the jury to convict the petitioner "as part of a general war on crime and for the protection of society." Petitioner contends at paragraph 71 that the prosecutor made an improper appeal to the religious considerations of the jury during closing arguments in the guilt phase of trial when the prosecutor stated "like Mr. King said he has violated the most sacred laws of God and man, not only did he steal, but you can replace things like that, but he took a human being's life." Additionally, at paragraph 72 of the amended petition, petitioner has identified five comments or arguments advanced by the prosecutor during the guilt phase which "improperly appealed to sympathy for the victim's family and the impact the crime had on them." [40]

The remedy of federal habeas corpus is available only for the corrections of federal constitutional errors. It does not serve the office of general trial supervision for the correction of trial errors. Federal habeas corpus is appropriate to correct trial errors only when they have deprived the defendant of a fundamentally fair trial. Even arguments that are "undesirable, erroneous, or even 'universally condemned'" do not themselves warrant habeas corpus relief unless they infect the entire trial process to cause a denial of fundamental fairness. *See Donnelly v. De Christoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974) (*quoting Cupp v. Naughten*, 414 U.S. 141, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973)). Thus, the federal habeas court is required to undertake a two-step analysis to determine, first, whether the prosecutorial argument was improper and, second, if improper, whether it infected the entire trial process to deny the defendant fundamental fairness. In *Brooks v. Kemp*, 762 F.2d 1383 (11th Cir.1985) (en banc), the Eleventh Circuit Court of Appeals sitting en banc addressed the question of what is meant by the denial of fundamental fairness in the context of prosecutorial arguments. Citing to the standard explicated by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the court of appeals held:

> For all these reasons, we conclude that the *Strickland v. Washington* test, requiring an assessment of errors to determine whether there is a reasonable probability that they changed the outcome of the case, is applicable to our analysis of whether improper closing arguments delivered by the prosecuting attorney rendered the capital sentencing hearing fundamentally unfair.

*Brooks v. Kemp*, 762 F.2d 1383, 1402 (11th Cir.1985) (en banc). While the discussion in *Brooks* arose in the context of a capital *sentencing* hearing, the same considerations necessarily apply to the guilt phase of the capital case. The question becomes, therefore, whether improper arguments by the prosecutor create a "reasonable probability" that the

---

**40.** Respondents contend that this claim is procedurally barred from consideration under *Wainwright v. Sykes*. The record on direct appeal from conviction, however, indicates that the petitioner raised the improper prosecutorial argument issue on direct appeal, specifically pointing out several of the comments now challenged in this action. That issue was considered and rejected on the merits on direct appeal. *See Waldrop v. State*, 459 So.2d 953 (Ala.Crim.App.1983), and *Ex parte Waldrop*, 459 So.2d 959 (Ala.1984).

improper arguments changed the outcome of the proceeding.

▮▮▮ Petitioner first argues that the prosecutor improperly exhorted the jury to convict him as part of a general war on crime. He points to the following comments made by the prosecutor during the closing arguments of the guilt phase of trial:

> I apologize for staying up here the whole time, if you think I ought to sit down. To be quite frank, I can't stand it. I want to get up here and tell you about it. And, like Mr. Fannin [defense counsel] says, I probably will get—I will probably raise my voice during the course of my closing argument, and I do apologize to you at the outset if I do.
>
> \* \* \* \* \* \*
>
> And I would like to say this, I like to call it the four links, the four links in the chain of justice. One is the witnesses.... Two, is the police officers.... They have done an outstanding job and this community ought to be proud of them.... And then, the third link in the chain of justice is the DA's office, and I just pray that we have presented this case in the fashion that ya'll think is proper. The fourth link: it always comes down to ya'll. The jury is the most important link. Because ya'll make the decision. But I'll say this. When you want something you have got to be willing to pay a price. If you want this county to be safe from stuff like this that goes on, you have got to be willing to pay a price....
>
> \* \* \* \* \* \*
>
> Billy Wayne Waldrop and his partners-in-crime had no more regard for human life than you I would for a fly we swatted.... Even a four-legged animal could witness a crime such as this and cry. Mr. Donahoo's dog. You heard about that, that the little dog was crying tear [sic]. You heard that man over there tell you about that. Did you hear one hint of remorse in his voice? That is why I wanted you to hear the tape, in lieu of a transcript. One hint of remorse. Even a little dog could cry over something like this, but not that man and not his partners-in-crime. That shows you

more about him than anything else I could say.

▮▮▮ None of these comments by the prosecutor deprived the petitioner of fundamental fairness. The opening remark by the prosecutor indicating his anxiousness and enthusiasm did not convey to the jury any implication that the prosecutor was aware of additional information not presented in evidence. Plainly, the statement was intended as a mere introductory remark, containing an apology for the length and volume of his argument. Nor was the "four links in the chain of justice" argument improper. The prosecutor merely outlined the various roles played within the criminal justice system, and called upon the jury to consider the general and specific deterrent effects embodied in the criminal justice system. *See Brooks v. Kemp.* Finally, the prosecutorial argument about the victim's dog was merely a recounting of statements made by the petitioner during his tape-recorded confession. The prosecutor may properly remind the jury of the evidence that has been presented. Further, it is not improper for the prosecutor to point out to the jury lack of remorse on the part of the defendant.

▮▮▮ Even if the court were to view one or more of these particular comments as improper, it cannot be said that, taken together or separately, they denied the petitioner fundamental fairness. There is no reasonable probability that the outcome of the guilt/innocence determination would have been different if these arguments had not occurred. There was overwhelming evidence against the petitioner, including his own confession. Given the evidence against him, there is no reasonable probability that these arguments infected the entire trial and caused a denial of fundamental fairness. *See Brooks v. Kemp; see also Cobb v. Wainwright,* 609 F.2d 754 (5th Cir.), *cert. denied,* 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 857 (1980).

▮▮▮ Petitioner also contends that the prosecutor improperly appealed to religious considerations when he said:

> Like Mr. King said, he has violated the most sacred laws of God and man. Not

only did he steal, but you can replace things like that, but he took a human being's life.

While the comment makes a passing reference to the laws of God, that reference does not so imbue the comment with religious overtones that it loses its appropriateness in the context of the trial. The straightforward purpose of the comment was to remind the jury that the petitioner was not charged with a simple theft, but also with murder.

 At paragraph 72 of the second amended petition, petitioner points out several comments made by the prosecutor which he contends improperly appealed for sympathy for the victim's family. At one point, the prosecutor thanked the jury on behalf of the victim's family "who we represent here today." At another point in the argument, the prosecutor argued that the petitioner had "destroyed everything that that family had in that house." In responding to defense counsel's urging that the jury return a lesser conviction, the prosecutor stated that the petitioner was merely seeking sympathy and that the jury should be sympathetic toward the victims. The prosecutor also recounted evidence indicating that the petitioner had been to the victim's home several nights before the robbery and murder, and had seen there through the windows two of the victim's family members who left on a trip to Oklahoma the morning of the robbery and murder. The prosecutor called those two family members "the two luckiest people in this courtroom." Finally, the prosecutor urged the jury "to speak for" the various family members and the victim "because his lips are sealed and his eyes are closed."

These remarks identified by petitioner during the closing arguments of the guilt phase of trial were not improper nor did they deny him a fundamentally fair trial. The remarks by the prosecutor did not attempt to enflame the jury to find the petitioner guilty solely on the basis of sympathy for the victim. Rather, they served the purpose of reiterating and recalling elements of the evidence offered at trial. The comment that the petitioner "destroyed everything that that family had in that house" merely re-emphasized dramatically that petitioner was charged with an intentional murder during the course of a robbery or burglary, and that the victim's home had been burned to the ground. The comment emphasized both elements of the offense by pointing out not only the theft, but also the murder. Similarly, the argument that the victim's wife and daughter were the "two luckiest people in this courtroom" also reiterated evidence heard at trial. The comment pointed out that there was evidence to believe that the petitioner had gone to the victim's house several days before the robbery and murder in order to scout the location and plan the robbery. Not only did this establish the petitioner's participation in the crime, but it emphasized the deliberate and calculated nature of the planning leading to the crime.

The prosecutor's argument that the jury should "have sympathy for the victims, too" was an attempt to off-set the sympathy argument being advanced on behalf of the petitioner. In *Davis v. Kemp*, 829 F.2d 1522 (11th Cir.1987), the court of appeals dealt with a similar argument in which the prosecutor stated that the jury should not feel sympathy for the defendant while ignoring and overlooking the suffering by the victim. The court held that it was an appropriate argument emphasizing retribution as a proper function of the criminal justice system and, particularly, the death penalty itself. As the court said, "The prosecutor's arguments seeking to justify the execution of [the defendant] based upon society's legitimate interest in purging itself of this wrong was a permissible argument." *Davis v. Kemp*, 829 F.2d 1522, 1528 (11th Cir.1987). Likewise, the prosecutor's comment that the jury should speak for the victim and his family "because his lips are sealed and his eyes are closed" was an attempt to emphasize the retribution function of capital punishment in the criminal justice system.

 None of the prosecutor's so-called "sympathy" arguments identified by the petitioner was improper. Even if they are seen as improper, they plainly did not deny the petitioner a fundamentally fair determination of his guilt or innocence. The overwhelming evidence against him, including his own confession, plainly established his role in the

robbery/murder. Thus, under the two-step analysis required for reviewing allegedly improper prosecutorial arguments, petitioner cannot establish a reasonable probability that the outcome of his guilt or innocence determination would have been different if these arguments had not been made.

*B. Sentencing Phase Arguments*

 In addition to identifying comments made by the prosecutor during closing arguments in the guilt phase of trial, petitioner also alleges that certain remarks made by him during final arguments in the penalty phase were improper and denied him a fair penalty hearing. While the same two-step analysis for reviewing allegedly improper prosecutorial comments applies, the second prong of the test requires the court to assess whether there is a reasonable probability that the sentencing recommendation made by the jury would have been different in the absence of these allegedly improper arguments. As the Eleventh Circuit has said:

> Generally the court engages in a two-step process in determining whether a habeas petitioner is entitled to relief based upon a prosecutor's argument. First, we consider whether the prosecutor's arguments were improper. Second, we consider whether any arguments found improper were so prejudicial as to render the trial fundamentally unfair. As we noted in *Brooks [v. Kemp]*, 762 F.2d 1383, 1400 (11th Cir. 1985) (en banc), *vacated on other grounds*, 478 U.S. 1016, 106 S.Ct. 3325, 92 L.Ed.2d 732 (1986) [*re-instated on remand*, 809 F.2d 700 (11th Cir.) (en banc) (per curiam), *cert. denied*, 483 U.S. 1010, 107 S.Ct. 3240, 97 L.Ed.2d 744 (1987) ], it is not our duty to ask whether a particular remark was unfair; we are concerned with whether it rendered the entire trial unfair.

*Davis v. Kemp*, 829 F.2d 1522, 1526 (11th Cir.1987). Later, in *Burden v. Zant*, 903 F.2d 1352 (11th Cir.1990), the Eleventh Circuit observed:

> *Proper* prosecutorial argument, "no matter how 'prejudicial' or 'persuasive,' can never be unconstitutional," [citation omitted], and even improper statements will not warrant habeas relief unless they render the sentencing proceeding fundamentally unfair [citation omitted]; *see Williams [v. Kemp*, 846 F.2d 1276, 1283 (11th Cir.1988), *cert. denied*, [494] U.S. [1090], 110 S.Ct. 1836, 108 L.Ed.2d 965 (1990) ] (when making fundamental unfairness determination, court "ask[s] whether there is a 'reasonable probability' that, but for the prosecutor's offending remarks, the outcome of the sentencing hearing would have been different").

*Burden v. Zant*, 903 F.2d 1352, 1365 (11th Cir.1990).

 Petitioner has advanced the same arguments with respect to penalty-phase comments as he did regarding guilt phase remarks. During the closing arguments of the penalty phase, the prosecutor made the following statement:

> Well, I'll just tell you this. I have done my job, Mr. King has done his job, and the police officers have done their job, and the witnesses have done their job. They and you. It is up to you as to what kind of county we are going to have. It is up to you whether you are going to let a man like that come down here and rob and burglarize and kill the citizens of this county.
>
> And they talk about capital punishment this, and a meaningful life sentence. You tell these ladies who worked out in these convenience stores that it don't mean any more to rob than it does if you rob and kill them [sic], where they destroy the witnesses. It is up to you what kind of county you are going to have....
>
> ... Everybody on this jury believes that if somebody comes to your house, that you have got the right to kill them to protect your family, to protect your loved ones. Don't take away society's right of self-defense because that is what this case is about.
>
> There is the killer and society should have the right to self-defense against people like that.

*See* Paragraph 70 of the *Second Amended Petition*, quoting Penalty Phase Transcript, p. 30–31, Tab R–23. Petitioner argues that this statement by the prosecutor was a preju-

dicial attempt to have the jury join a general war on crime rather than focus on the particular sentencing factors relevant to the case before them. But the argument is a proper comment upon the general and specific deterrent effects of capital punishment. *See Brooks v. Kemp, supra;* Burden v. Zant, supra.

▮ The prosecutor also stated:

Our legislature, you know, we are governed by the laws of God and man. And I'll submit to you the laws of God. He believed in capital punishment and you will find it many times throughout the Bible.

*See* Paragraph 71 of the *Second Amended Complaint,* quoting from the Penalty Phase Transcript, p. 29, Tab R–23. While the prosecutor's references to the laws of God and His support of capital punishment probably were improper, the court concludes that the comments did not deny the petitioner a fundamentally fair trial. Although they seem to direct the jury's attention to a different source of law than that supplied by the law of the State of Alabama, it is plain that the entire proceedings during the sentencing phase focused the jury's attention on Alabama law and its balancing of aggravating and mitigating circumstances. Indeed, the opening statement made by the prosecutor and the opening portion of the prosecutor's closing argument both emphatically directed the jury's attention to an assessment of aggravating circumstances authorized by Alabama law in the absence of any mitigating circumstances. The passing reference to the laws of God was not so inflammatory that there is a reasonable probability that the outcome of the sentencing proceeding would have been different if the argument had not been made.

▮ Finally, the prosecutor also made the following comment:

They [defense counsel] want to talk about a penitentiary sentence and a meaning [sic] life sentence and life without parole. If justice had been done in 1973, I submit to you that Thurmon Macon Donahoo, Sr. would still be alive. I would submit to you that he would still be alive. And we wouldn't be in this courtroom today and his family wouldn't have to be sitting here

going through this, and ya'll wouldn't. And we all wish that.

*See* Paragraph 72 of the *Second Amended Petition, quoting* the Penalty Phase Transcript, p. 27. Petitioner argues that this comment improperly inflamed the jury to impose the death penalty out of sympathy for the victim. On the contrary, the argument tended to show the future dangerousness of petitioner. *See Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); *Davis v. Kemp,* 829 F.2d 1522 (11th Cir.1987). The argument was made in the context that the prosecution had proved a statutory aggravating circumstance in that the petitioner had been previously convicted in 1973 of two murders in Calhoun County, Alabama. Plainly, the force of the argument was to show that, having once committed murder, the petitioner did so again in the case at hand. Further, the argument implied that, if the death penalty was not imposed, petitioner would continue to be a future danger to commit murder. Such an argument based upon the future dangerousness of the petitioner is a proper factor for consideration in the sentencing phase. Thus, the argument was not improper.

*C. Argument Diminishing Jury's Role*

▮ Finally, at paragraph 73 of the second amended petition, petitioner seems to assert a claim under *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), contending that the prosecutor's description of the four links in the chain of justice, coupled with the court's instruction that the jury would make a sentencing "recommendation," tended to diminish the jury's sense of its responsibility for imposition of the capital sentence. This argument lacks merit, however, because nothing in the prosecutor's comments or in the court's instruction erroneously misled the jury about its proper role. In *Darden v. Wainwright,* 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), the Supreme Court explained that *Caldwell* applies only to comments that *"mislead the jury as to its role* in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision." *Darden v. Wainwright,* 477 U.S.

932

168, 184, n. 15, 106 S.Ct. 2464, 2473, n. 15, 91 L.Ed.2d 144 (1986) (Emphasis added). It is not enough to establish a *Caldwell* violation merely that the comment of the prosecutor tends to diminish the jury's role in relation to others players in the criminal justice system. The comment must *mislead* the jury about its correct role. Nothing in the comments made by the prosecutor led the jury to believe that the sentencing function lay anywhere other than with it.[41] Hence, there was no improper diminishment of the jury's role.

## VII. Procedural Default of Remaining Claims

 The remaining three claims asserted in the second amended petition for writ of habeas corpus are barred from consideration under the procedural default doctrine of *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). At Sections E, F, and G of the second amended petition, petitioner sets forth three final claims for habeas corpus relief. At Section E, he asserts that the trial judge improperly and erroneously relied on hearsay in the presentence report he considered before imposing the death penalty. At Section F of the second amended petition, petitioner asserts that the statutory aggravating factors found by the trial court to justify the imposition of the death penalty were invalid. He argues that his 1975 guilty pleas to murder charge, which were the foundation of the prior murder convictions, were unknowing and involuntary under *Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969). Conse-

quently, reliance on the prior murder convictions as an aggravating factor for purposes of imposition of the death penalty in this case was improper. Finally, at Section G of the second amended petition, petitioner relies on the case of *Cage v. Louisiana*, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990), to argue that the trial court's instruction to the jury on "reasonable doubt" violated his rights under the due process clause by equating it with a "substantial doubt."

Common among these three claims is the fact that none has ever been presented to a state court for consideration. While trial counsel objected to the sentencing judge's consideration of hearsay in the presentence report at the original sentencing hearing, that issue was not argued on direct appeal or otherwise presented in any other coram nobis or Rule 20 petition. As such, it was not exhausted and effectively is the same as an issue never presented in state court. *See Collier v. Jones, supra.* Similarly, no challenge to the validity of the aggravating factors found by the trial court or to the propriety of the court's instructions on reasonable doubt has ever been argued on direct appeal, in the petition for error coram nobis, or in the Rule 20 petition filed in 1988.

Because none of these claims has ever been presented to a state court, the question arises whether there is an unexhausted state remedy still available for one or more of these claims or whether they are now barred from consideration under applicable state procedures. The only state remedy that might now be available to the petitioner

---

41. An interesting question that perhaps need not be decided here is whether the jury's *recommendation* as to sentencing in Alabama has any constitutional significance. Unlike juries in Georgia and Florida, whose sentencing recommendations have legal weight that cannot be disregarded by the trial judge except under special circumstances, the sentencing recommendations of juries in Alabama have no legally binding effect on the sentencing judge. *See Alabama Code* § 13A–5–47(e) (1982). The trial judge under Alabama law is required to hold a separate capital sentencing hearing at which the *court* must make findings on the existence of aggravating factors and mitigating circumstances. *See Alabama Code* § 13A–5–47 (1982). The jury's recommendation is advisory and to be considered, but "it is not binding upon the court." *Alabama Code* § 13A–5–47(e) (1982). That being the case, it

can be argued that the jury in Alabama has *no real* role in capital sentencing, making it difficult if not impossible for a prosecutor or judge to *mislead* the jury into believing it has a lesser role in sentencing than it actually has. Similarly, it might be argued that, because the jury is *not* the sentencer in Alabama, a professionally deficient performance by counsel during the jury/penalty phase of trial does not amount to ineffective assistance of counsel because it cannot have an effect on the *real* sentencing decision to be made by the trial judge. Yet, recently, in *Nelson v. Nagle*, 995 F.2d 1549 (11th Cir.1993), the court of appeals affirmed the grant of habeas relief ordering a new sentencing hearing because of prejudicial arguments to the *jury* during the penalty phase. This seems to imply that the jury's role does have significance, although it is difficult to see.

would be a successive petition for Rule 32 relief (formerly Rule 20) under the *Alabama Rules of Criminal Procedure.* In 1987, the *Alabama Rules of Criminal Procedure* unified the various post-conviction, collateral remedies then known under Alabama law into a standard petition to vacate or set aside a conviction or sentence under Rule 20. Later, the *Alabama Rules of Criminal Procedure* were re-codified and Rule 20 became what is today Rule 32. The essential substantive provisions of the rule, however, have remained unchanged since 1987.

Presentation of these claims in a new Rule 32 petition now appears to be barred for at least two reasons. First, the filing of a new Rule 32 petition would be successive inasmuch as petitioner filed a Rule 20 action in November of 1988, which was litigated to conclusion. Second, the consideration of a new Rule 32 petition is barred by the two-year limitation provision found at Rule 32.-2(c). That rule provided a two-year grace period from April of 1987 to April of 1989 for the presentation of any challenges to convictions final prior to the effective date of the rule. Because petitioner's conviction and sentence became final before April of 1987, he was required to present all challenges to his conviction and sentence during that two-year period. In fact, he did file a petition in November of 1988. Because it is now more than four years after the expiration of the two-year grace period, he may not now file a new Rule 32 petition challenging the validity of his conviction and sentence. The two-year limitation period is an independent and adequate state basis for precluding relief on these three claims. *See Harris v. Reed,* 489 U.S. 255, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989); *Whiddon v. Dugger,* 894 F.2d 1266 (11th Cir.1990). Consequently, not only would a new Rule 32 petition be successive in violation of Rule 32.2(b), it would also be untimely under the provisions of Rule 32.2(c).

In order to avoid these twin procedural bars, petitioner must show cause for his failure to present these claims in the earlier petition during the two-year grace period, and actual prejudice resulting from the lack of consideration of the claims. *See Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct.

2497, 53 L.Ed.2d 594 (1977); *Engle v. Isaac,* 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982); *Wilson v. Jones,* 902 F.2d 923 (11th Cir.1990). The cause-and-prejudice test of *Wainwright v. Sykes* is in the conjunctive, requiring petitioners seeking to avoid a procedural default to prove both cause *and* prejudice. Describing the cause-and-prejudice standard, the Supreme Court stated in *Amadeo v. Zant,* 486 U.S. 214, 108 S.Ct. 1771, 100 L.Ed.2d 249 (1988):

In *Wainwright v. Sykes,* 433 U.S. 72 [97 S.Ct. 2497, 53 L.Ed.2d 594] (1977), this court adopted the "cause and prejudice" requirement of *Francis v. Henderson* [425 U.S. 536, 96 S.Ct. 1708, 48 L.Ed.2d 149 (1976)], *supra,* for all petitioners seeking federal habeas relief on constitutional claims defaulted in state court. The *Sykes* court did not elaborate upon this requirement, but rather left open "for resolution in future decisions the precise definition of the 'cause'—and—'prejudice' standard." 433 U.S. at 87 [97 S.Ct. at 2507]. Although more recent cases likewise have not attempted to establish conclusively the contours of the standard, they offer some helpful guidance on the question of cause. In *Reed v. Ross,* 468 U.S. 1 [104 S.Ct. 2901, 82 L.Ed.2d 1] (1984), the court explained that although a "tactical" or "intentional" decision to forego a procedural opportunity normally cannot constitute cause [citation omitted], "the failure of counsel to raise a constitutional issue reasonably unknown to him is one situation in which the [cause] requirement is met." *Id.* at 14 [104 S.Ct. at 2909]. The court later elaborated upon *Ross* and stated that "the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the state's procedural rule." *Murray v. Carrier,* 477 U.S. 478, 488 [106 S.Ct. 2639, 2645, 91 L.Ed.2d 397] (1986). We explained that "a showing that the factual or legal basis for a claim was not reasonably available to counsel, ... would constitute cause under this standard." *Ibid.*

*Amadeo v. Zant,* 486 U.S. 214, 221–222, 108 S.Ct. 1771, 1776, 100 L.Ed.2d 249 (1988). Thus, ordinarily a showing of cause must

establish something other than the prisoner's or his attorney's mere lack of awareness of claims that are reasonably available to him.

In addition to cause, the petitioner must show actual prejudice. To do so, he must show "not merely that the errors ... created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady,* 456 U.S. 152, 170, 102 S.Ct. 1584, 1596, 71 L.Ed.2d 816 (1982) (Emphasis in original).

 Plainly, petitioner cannot show cause justifying his failure to present his hearsay claim and invalid aggravating factors claim in his earlier Rule 20 petition. Both the factual and legal bases for these claims were available to him in 1988, both having arisen out of the trial or events that occurred long before the trial. Counsel's failure to recognize these potential claims at the time of the filing of the 1988 petition, even if that failure rises to the level of ineffectiveness, cannot serve as cause excusing the procedural default because there is no Sixth Amendment right to counsel in collateral proceedings. *See Pennsylvania v. Finley,* 481 U.S. 551, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987); *Coleman v. Thompson,* 501 U.S. 722, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). These claims were reasonably available to counsel and petitioner when he filed his 1988 Rule 20 petition so that his failure to include those claims in that action bars their presentation now both in a new Rule 32 action and in this habeas petition, and he has shown no "cause" for that default.

 The court also concludes that petitioner cannot establish cause to excuse his failure to present the jury-instruction claim based on *Cage v. Louisiana.* While it might be argued that *Cage* announced a rule of law so novel that could not be reasonably anticipated by counsel at the time of the filing of the earlier coram nobis and Rule 20 petitions, the court is persuaded that *Cage* did not involve a novel rule,[42] but a mere application of *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). Indeed, the United States District Court for the Southern District of Alabama held:

> Although no federal court has directly ruled that *Cage* is not a novel claim, the court is certain that *Cage,* a short, unsigned opinion, is no more than an application or extension of the principles of *In Re Winship,* far from being a claim so novel that its legal basis was not reasonably available to counsel at an earlier stage. Therefore, petitioner cannot show cause for failure to raise [the *Cage* claim] in the earlier habeas corpus action.

*Singleton v. Thigpen,* 806 F.Supp. 936, 943 (S.D.Ala.1992).[43] Bolstering this conclusion is the fact that the Supreme Court itself in *Cage* cited a number of earlier opinions by courts of appeals criticizing attempts to define reasonable doubt in a manner similar to that struck down in *Cage.* Plainly, the earlier opinions by the courts of appeals indicate that *Cage* was not a novel rule of law, but a mere extension or application of the earlier rule of law established in *In re Winship.*

**42.** The Fifth Circuit Court of Appeals held in *Skelton v. Whitley,* 950 F.2d 1037 (5th Cir.1992), that the ruling in *Cage* was a "new rule" under *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), and, *a fortiori,* new for purposes of establishing cause as an exception to procedural default. But this court disagrees with this linking of *Teague* and "cause." The standards are actually very different. Under *Teague,* a ruling is "new" if it is not *dictated* by prior precedent, a very narrow category of cases. On the other hand, a ruling is "novel" for purposes of "cause" in the context of procedural default only if its essential legal components were not reasonably ascertainable and available to counsel. It is plainly possible that the legal elements of a claim can be available and reasonably recognizable without being *dictated* by prior precedent. Incremental steps and refinements of existing law are reasonably available for argument even if the outcome of the argument is not *dictated* by the law then in existence. Hence, a rule that is "new" under *Teague* is *not* necessarily so "novel" that it cannot be recognized and argued. The novelty of the claim is not cause for the failure to assert it merely because it is "new" under *Teague.*

**43.** The district court's opinion in *Singleton* was essentially affirmed when the United States Court of Appeals for the Eleventh Circuit denied petitioner's application for certificate of probable cause and motion for stay of execution. Similarly, the United States Supreme Court denied Singleton's motion for stay of execution the next day. *Singleton v. Thigpen,* —— U.S. ——, 113 S.Ct. 515, 121 L.Ed.2d 449 (1992).

Not being a novel rule of law, the basic legal principles were available to the petitioner to assert this claim at least at the time of his 1988 Rule 20 petition. The essential legal nature of the claim was provided by *In re Winship* and was available to the petitioner and his counsel. The mere fact that *Cage* was announced some two years later does not indicate that the rule it involved was so novel that there was cause for petitioner's failure to assert the claim earlier. Hence, petitioner cannot establish the cause prong of the cause and prejudice exception to procedural default. Nor has he made a colorable showing of factual innocence, either as to the offense itself or as to the death sentence, to come within the "fundamental miscarriage of justice" exception to the rule.

*VIII. Conclusion and Denial of Relief*

Having carefully addressed each of the claims for habeas corpus relief asserted by the petitioner in this action, the court finds them either meritless or barred from consideration on one or more grounds. None of the claims entitles petitioner to relief, and, therefore, the petition for writ of habeas corpus is due to be denied. A separate final judgment to that effect will be entered.